27 LRA136n

VAN H. HIGGINS *et al.*

*v.*

KILLIAN V. R. LANSINGH, Admr. *et al.*

*Filed at Ottawa January 15, 1895.*

1. CORPORATIONS—*when stockholder is chargeable with notice of issue of stock and its consideration.* A stockholder holding in trust and voting five-eighths of the capital stock of the corporation, of which he has been also manager for more than twenty years, dating back to within less than three years of the incorporation, is chargeable with notice of the issue of stock and scrip under orders of the board, and of the lack of any consideration therefor, except an equity in land taken by the company.

2. SAME—*holders of scrip may redeem pledged stock.* Holders of conditional scrip in a corporation, who are equitable owners of pledged stock subject to the pledge, have the right to redeem it by paying the debt at any time after it is due.

3. SAME—*excessive issue of stock not a fraud on the company itself.* The issue of stock by a corporation for much more than the value of land which constitutes its only capital, when there are no other stockholders or creditors of the company to complain, cannot be held to be a fraud on the company itself.

4. SAME—*when holders of preferred stock cannot claim to be exclusive stockholders.* Holders of preferred stock authorized and created by the holders of common stock cannot claim to be the only stockholders, where, for more than twenty years, they have stood by while the holders of the common stock have elected the managers and performed all other acts as stockholders of the company.

5. SAME—*when corporation cannot avoid scrip and stock for want of consideration.* A corporation cannot avoid an issue of stock and scrip for lack of consideration, or insist on further payment therefor, where successive boards of managers, elected in the main by creditors, and not by the holders of such scrip and stock, have for more than twenty years acquiesced in the transaction, and ratified it in many ways.

6. SAME—*equitable assignment of stock may be made by means of scrip.* An equitable assignment of corporate stock which has been pledged can be made by scrip certificates, although the language of such certificates recognizes the necessity of a return and cancellation of the old certificates and the issue of new ones, in order to transfer the legal title.

7. SAME—*what will create an equitable title to stock.* An equitable title to stock of a corporation which has been pledged by the com-

| 154 | 301 |
| 64a | 476 |
| 66a | 433 |
| 154 | 301 |
| 166 | 60 |
| 154 | 301 |
| 173 | 420 |
| 154 | 301 |
| 80a | 297 |
| 154 | 301 |
| 179 | 479 |
| 154 | 301 |
| 98a$^2$$^4$ | 406 |
| 154 | 301 |
| 195 | $^1$297 |
| 154 | 301 |
| e206 | 268 |
| e206 | 270 |
| 107a$^1$$^1$ | 378 |
| 154 | 301 |
| 209 | 382 |
| 112a | 301 |
| 154 | 301 |
| 214 | 599 |
| 113a | 427 |

pany, and not merely an executory agreement for stock, is created by scrip certificates declaring that the holder is entitled to a specified sum, payable in the stock held by the pledgee, at any time after it shall come again into possession of the company.

8. SAME—*creditors of company not charged with misconduct of officers they elect.* Creditors of a corporation cannot be compelled, as mortgagees in possession, to account for alleged mismanagement of the company by managers regularly elected, although the creditors had the controlling voice in the election by virtue of shares of stock pledged in trust to secure their debts, especially where the alleged mismanagement has been long acquiesced in by the parties complaining.

9. SAME—*contract obtained through vote of interested director not valid.* A disinterested majority of directors is necessary to make a valid contract with a corporation by action of the board, and the contract is invalid if the vote of an interested party is necessary to make it, whether the directors act in good faith or not.

10. SAME—*when corporation may seek relief against usurious contract.* A statutory provision that a corporation shall not interpose the defense of usury will not prevent a corporation or its stockholders from obtaining relief against an inequitable and usurious contract, when one or more of its managers voting to make the contract had a personal interest therein.

11. SAME—*contract between corporation and its directors set aside if injurious.* An agreement between a corporation, by its board of directors, on the one hand, and one or more of such directors on the other, will be set aside if injurious and oppressive to the company, even though the company was represented by a majority of disinterested directors.

12. SAME—*when corporation not accountable to managers for profits.* The profits made by a corporation on land purchased from its managers, who acted in a double capacity in making the contract, and who had themselves purchased the land at a much lower price, can not be claimed by such managers because the corporation repudiates the purchase so far as to claim from them the profits which they had improperly made on their sale of the land to the corporation.

13. SAME—*rights of officer purchasing securities of the corporation at a discount.* An officer of a corporation who purchased at a discount securities issued by it cannot be allowed to enforce them for their face value, where, at the time of the purchase, he practically controlled the corporation, owning the greater part of the secured claims against it and substantially all of its preferred stock, especially where he did not inform the other members of the board of managers of the corporation of the intended sale of the securities, and they did not know thereof.

14. SAME—*when holders of preferred stock need not account for dividends.* A corporation, or the holders of stock or scrip therein, can not compel an accounting for dividends received on preferred stock, on the ground that the issue of such stock was *ultra vires*, after they have received full value for the stock, authorized its issue, paid dividends on it and long treated it as valid.

15. SAME—*preferred stock issued without authority in charter.* Lack of authority in the charter for the issue of preferred stock will not prevent stock otherwise properly issued from being valid as preferred stock, if it was issued by the original authority and consent of all the shareholders, or has received their subsequent ratification or long acquiescence.

16. ACTION—*to redeem pledged stock by owner of part of it.* A suit to redeem all the stock of a corporation pledged, although brought by the owner of only a part of it, is not subject to objection as dividing the claims against the pledgee.

17. SAME—*owner of part of pledged stock may represent the company.* The equitable owner of a part of the stock pledged by a corporation has a right to represent the company, and sue, on its behalf as well as his own, to redeem the stock, where the corporation is controlled and practically owned by the creditor for whose debt the stock is pledged.

18. SAME—*demand on managers of corporation to bring suit—when not necessary.* A demand on the managers of a corporation to bring a suit is not necessary before suit by an owner of stock, when it is shown that such demand would have been unavailing.

19. SAME—*accounting of treasurer of corporation cannot be had where he is not a party.* An accounting for alleged frauds of the treasurer of a corporation cannot be had in a suit to which he is not a party, although one of the defendants is charged with having taken from him corporate notes and stock with notice of the facts.

20. EQUITY—*jurisdiction of, to enforce equitable interests.* An objection that an adequate remedy at law defeats the bill, is not valid where the relief sought is to enforce equitable interests in stock of a corporation, converting them into legal ownership, to redeem pledged stock, compel an accounting, and set aside illegal contracts.

21. EVIDENCE—*presumption of ownership of securities from possession.* The presumption of *bona fide* ownership of two $5000 certificates of conditional scrip in a corporation, raised by their possession and production on the trial, together with one for $9000, is not overcome by the mere fact that twenty-five years after the transaction neither the original certificates for which the one of $9000 is supposed to have been given, nor any book account of the company showing their return, can be found, especially where the scrip was

not of great value at the time of issue, and the $5000 certificates might have been obtained from different sources.

22. Contracts—*party rescinding must restore property obtained.* A rescission of a sale of land to a corporation at an excessive price cannot be made without restoring the land, by mere reduction of the price, simply because the corporation has made extensive and permanent improvements on the land.

23. Notice—*to one member of firm is notice to all.* A partnership is chargeable with notice of all the facts and circumstances known to one of the firm affecting a purchase made for it by him.

24. Same—*when corporation not charged with facts known to its president.* A corporation making a purchase from its president is not chargeable with his knowledge of infirmities in his title to the property.

25. Bonds—*when purchasers of, charged with notice of defenses.* The purchaser of bonds expressly reciting that they are for the principal and interest of other bonds which are held as collateral security, is chargeable with notice of the fact that the indebtedness secured was overdue, and he is therefore subject to all infirmities attaching to it, although the date of payment named in the original bonds held as collateral was later than the time of purchase.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. Murray F. Tuley, Judge, presiding.

John J. Herrick, for appellant Van H. Higgins:

The capital stock of a corporation must be paid for in money or tangible property, which shall represent that capital to creditors and the public, as well as the stockholders. *Sturges* v. *Stetson*, 1 Biss. 241; *Fisher* v. *Railway Co.* 53 Barb. 513; *Railroad Co.* v. *Kelly*, 77 Ill. 426; *People* v. *Sterling Manf. Co.* 82 id. 458; *Tobey* v. *Robinson*, 99 id. 222; Field on Corp. sec. 126; Brice's Ultra Vires, 153; 1 Morawetz on Corp. secs. 306, 427, 428.

The express authority to issue the certificates only "for sums of money" to be called in, or "real estate or personal property at an equitable valuation," was in fact an implied prohibition against issuing them without consideration, or on any consideration other than "money" or

"real estate or personal property at an equitable valuation." *People* v. *Sterling Manf. Co.* 82 Ill. 462 ; *Tobey* v. *Robinson,* 99 id. 233 ; *Terwilliger* v. *Telegraph Co.* 59 id. 258; *Sturges* v. *Stetson,* 1 Biss. 246; 1 Morawetz on Corp. sec. 427; *Cent. T. Co.* v. *Car Co.* 139 U. S. 48 ; *Chicago* v. *Cameron,* 120 Ill. 447; *Hall* v. *Road Co.* 70 id. 676; *Railroad Co.* v. *Kelly,* 77 id. 436.

The directors had no authority to bestow these certificates gratuitously upon themselves or others. *Hall* v. *Road Co.* 70 Ill. 676 ; *Coleman* v. *Railroad Co.* 38 N. Y. 203 ; *Barnes* v. *Brown,* 80 id. 584; *Wardell* v. *Railway Co.* 103 U. S. 651 ; *Gridley* v. *Railroad Co.* 71 Ill. 202; Morawetz on Corp. secs. 517, 518, 523.

Managing officers of a corporation are disabled by law from acting upon any matter which involves a corporate obligation or other corporate action, in their own favor, or in which they are interested. *Gridley* v. *Railway Co.* 71 Ill. 200 ; *Holder* v. *Railway Co.* id. 106; *Manufacturing Co.* v. *Emri,* 54 id. 346 ; *Coppell* v. *Manufacturing Co.* 47 Hun, 234; *Butts* v. *Wood,* 37 N.Y. 367; *Coleman* v. *Railroad Co.* 38 id. 201 ; *Bank* v. *Railroad Co.* 11 Daly, 367 ; *Gardner* v. *Butler,* 37 N. J. Eq. 702.

The certificates were, in effect, promises to pay in stock. They were non-negotiable, and an assignee would take them subject to all equities or defenses. *Bank* v. *McCrea,* 106 Ill. 181; *Turner* v. *Railroad Co.* 95 id. 134; *Shirk* v. *People,* 121 id. 65; *Skinner* v. *Somers,* 14 Mass. 107; *Bailey* v. *Gas Co.* 27 N. J. Eq. 200 ; *Olds* v. *Cummings,* 31 Ill. 188 ; *McClelland* v. *Railroad Co.* 110 N. Y. 469.

Illegality cannot be waived. Even an attempted confirmation is affected by the original taint. 1 Morawetz on Corp. sec. 619 ; *Coppell* v. *Hall,* 7 Wall. 558 ; *Thomas* v. *Railroad Co.* 1 McCrary, 392; *Railroad Co.* v. *Dewey,* 14 Mich. 477; *Hooker* v. *Durant,* 11 R. I. 207; *Negley* v. *Lindsay,* 67 Pa. St. 217; *Bailey* v. *Gas Co.* 27 N. J. Eq. 196.

The scrip certificates being illegal, there is and can be no estoppel against setting up their invalidity. *Mora-*

wetz on Corp. secs. 1619, 1620; *Coppell* v. *Hall*, 7 Wall. 558; *Marsh* v. *Fulon Co.* 10 id. 676; *Hazard* v. *Owen*, 11 R. I. 196; *Chicago* v. *Cameron*, 120 Ill. 462; *Cent. T. Co.* v. *Car Co.* 139 U. S. 48; *Franklin Co.* v. *Bank*, 68 Me. 43.

An *estoppel in pais* can only arise by reason of something which is *dehors* the writing—some act done outside of the instrument itself. Bispham's Eq. sec. 285 ; *Clark* v. *Sessions*, 22 N. Y. 312; *Bank* v. *Benham*, 118 id. 358.

The finding and decree of the court below, that the scrip certificates transferred to the holder the equitable title to shares of the defendant company's stock, were erroneous. *Christmas* v. *Russell*, 14 Wall. 70; *Trist* v. *Child*, 21 id. 441; *Hoyt* v. *Story*, 3 Barb. 262; *Christmas* v. *Griswold*, 8 Ohio St. 263 ; *Ford* v. *Gardner*, 15 Ind. 298; *Hosack* v. *Rogers*, 18 Wend. 219 ; *Powers* v. *Wheat*, 27 Mo. 188; *Connelly* v. *Harrison*, 16 La. Ann. 41 ; *Eib* v. *Martin*, 5 Leigh, 132 ; *Grist's Appeal*, 104 Pa. St. 351; *Wyman* v. *Snyder*, 112 Ill. 99; 2 Hare & Wallace's Notes to Lead. Cas. in Eq. part 2, p. 233 ; *Railway Co.* v. *Nichols*, 57 Ill. 464; *Armour* v. *Merrill*, 6 Cush. 282; *Jermyn* v. *Moffatt*, 75 Pa. St. 3 ; *Williams* v. *Tayloe*, 8 Wall. 57; *Walter* v. *Brooks*, 125 Mass. 241; *Eichelberger* v. *Mendock*, 10 Md. 373 ; *McNimony* v. *Ferreis*, 3 Johns. 72 ; *Dunlap* v. *Berry*, 4 Scam. 327; *McLaughlin* v. *Piatti*, 27 Cal. 451; *Warten* v. *Strane*, 82 Ala. 311; *White* v. *Wilks*, 5 Taunt. 176.

J. L. HIGH, for appellants Henry W. Blodgett, trustee, and Van H. Higgins :

The scrip was illegal, and void *ab initio*. The managers had no power to issue it, and their action in voting it to themselves without consideration was a breach of trust, out of which no cause of action can arise against the corporation. 1 Morawetz on Corp. secs. 516-518; Rev. Stat. chap. 38, secs. 119, 120 ; *People* v. *Manufacturing Co.* 82 Ill. 458; *Tobey* v. *Robinson*, 99 id. 222 ; *Chicago* v. *Cameron*, 120 id. 447 ; *Wyman* v. *Bank*, 14 Mass. 58 ; *Gardner* v. *Butler*, 30 N. J. Eq. 702 ; *Bank* v. *Bank*, 17 Mass. 1 ; *Butts* v.

*Wood,* 37 N. Y. 317; *Coleman* v. *Railroad Co.* 38 id. 201; *Wardell* v. *Railroad Co.* 103 U. S. 651; *Loan Ass.* v. *Stonemetz,* 29 Pa. St. 534; *Holder* v. *Railroad Co.* 71 Ill. 106; *Gridley* v. *Railroad Co.* id. 202; *Railroad Co.* v. *Ketcham,* 27 Conn. 170; *Copeland* v. *Johnson Manf. Co.* 47 Hun, 235.

The old certificates were of no validity, and there was no consideration for the new. *Copp* v. *Sawyer,* 6 N. H. 386; *Hill* v. *Buckminster,* 5 Pick. 391; *Tuthill* v. *Davis,* 20 Johns. 285; *Bailey* v. *Gas Light Co.* 27 N. J. Eq. 196.

The company cannot, without his consent, divide its single right of action against Blodgett for the redemption of the stock into several distinct rights of action, and assign these to different holders of the scrip. *Mandeville* v. *Welch,* 5 Wheat. 277; *Tiernan* v. *Jackson,* 5 Pet. 580; *Shankland* v. *Corporation,* id. 390; *Stone* v. *Pratt,* 25 Ill. 16; *Railroad Co.* v. *Nichols,* 57 id. 464; *Moore* v. *Gravelot,* 3 Ill. App. 442; *Creighton* v. *Hyde Park,* 6 id. 272; *Geist's Appeal,* 104 Pa. St. 351; *Eichelberger* v. *Murdock,* 10 Md. 373; *Wilson* v. *Carson,* 12 id. 54.

Nor can there be an equitable assignment without a valuable consideration to support it, and the consideration must be fully paid or executed, so as to constitute the vendor a naked trustee. *Estate of Webb,* 49 Cal. 541; *Wilbur* v. *Warren,* 104 N. Y. 192; *People's Bank* v. *Church,* 109 id. 512; *Lamprey* v. *Lamprey,* 29 Minn. 151; *Kennedy* v. *Ware,* 1 Barr, 445; *Smith* v. *Wood,* 12 Wis. 382; 3 Pomeroy's Eq. Jur. secs. 1293, 1405, notes.

The issuing of the preferred stock having been originally authorized by a vote of the shareholders, and the corporation having received full payment therefor, can not now be questioned, the parties in interest having acquiesced for more than twenty years. 1 Morawetz on Corp. 464; Cook on Stockholders, sec. 268; *Kent* v. *Quicksilver Mining Co.* 78 N. Y. 159; *Hazlehurst* v. *Railroad Co.* 43 Ga. 13; *Lockhart* v. *Van Alstyne,* 31 Mich. 76; *Taylor* v. *Railroad Co.* 13 Fed. Rep. 152.

Both principal and interest being in arrears, it was lawful to convert the unpaid interest into principal, and to execute new obligations of the company for the indebtedness thus ascertained. *Haworth* v. *Huling,* 87 Ill. 23; *Thayer* v. *Mining Co.* 105 id. 540; *Wilcox* v. *Howland,* 23 Pick. 167; *Meeker* v. *Hill,* 23 Conn. 574; *Quimby* v. *Cook,* 10 Allen, 32; *Telford* v. *Garrels,* 132 Ill. 550.

A stockholder or director may lawfully contract with or sell to the corporation. While such contracts are carefully scrutinized by the courts, they will be upheld when made in good faith, and without fraud or undue influence. 1 Morawetz on Corp. sec. 527; *Merrick* v. *Coal Co.* 61 Ill. 472; *Harts* v. *Brown,* 77 id. 226; *Oil Co.* v. *Marbury,* 91 U. S. 587; *Hotel Co.* v. *Wade,* 97 id. 13; *Duncomb* v. *Railroad Co.* 88 N. Y. 1; *Kitchen* v. *Railroad Co.* 69 Mo. 224; *Chouteau* v. *Allen,* 70 Mo. 290; *Elkins* v. *Railroad Co.* 36 N. J. Eq. 233; *Parker* v. *Nickerson,* 137 Mass. 487.

Even if such sale be fraudulent, oppressive or obtained by undue influence, the right of rescission must be exercised within a reasonable time. *Warren* v. *Walbridge,* 61 Ill. 173; *Harts* v. *Brown,* 77 id. 226; *Oil Co.* v. *Marbury,* 91 U. S. 587; *State* v. *Smith,* 48 Vt. 266; *Ashhurst's Appeal,* 60 Pa. St. 290; *Wright* v. *Peet,* 36 Mich. 213; *Peabody* v. *Flint,* 6 Allen, 52.

Nor can there be a partial rescission in such cases, but the contract or sale must be rescinded as an entirety, and the *status quo* be restored. *Jennings* v. *Gage,* 13 Ill. 610; *Smith* v. *Doty,* 24 id. 164; *Bowen* v. *Schuler,* 41 id. 192; *Lovingston* v. *Short,* 77 id. 587; *Preston* v. *Spaulding,* 120 id. 208; *Masson* v. *Bovet,* 1 Denio, 69; *Thayer* v. *Turner,* 8 Metc. 551; *Kimball* v. *Cunningham,* 4 Mass. 502; *Stewart* v. *Dougherty,* 3 Dana, 479.

PARKER & HIGGINS, also for appellant Van H. Higgins:

The legal and equitable title and ownership of the property and assets of a corporation are in itself. *Butler* v.

*Hoffman*, 61 Wis. 20; *People ex rel.* v. *Manufacturing Co.* 99 Ill. 357; 1 Morawetz on Corp. secs. 233, 234; *Utica* v. *Churchill*, 33 N. Y. 161; *Hyatt* v. *Allen*, 4 Am. Corp. Cases, 370; *Railway Co.* v. *Railway Co.* 23 Minn. 359; *Baldwin* v. *Canfield*, 26 id. 43; *Van Allen* v. *Assessors*, 3 Wall. 584.

The facts showing that this paper was legally and properly executed must be pleaded and proven. Waterman on Specific Per. sec. 186; Fry on Specific Per. sec. 64; 1 Story's Eq. Jur. secs. 787, 793; *People's Bank* v. *Church*, 109 N. Y. 512; *State* v. *Webb*, 49 Cal. 542; *Wilbur* v. *Lyndes*, id. 290; *Smith* v. *Wood*, 12 Wis. 382; *Wadhams* v. *Gay*, 73 Ill. 415; *Perkins* v. *Parker*, 1 Mass. 117; Cook on Stockholders, secs. 716, 726; 3 Pomeroy's Eq. Jur. sec. 140; 1 id. sec. 383, note 1; Pomeroy on Contracts, secs. 57, 39, 40.

The provision for the company to receive the stock and to pay it over to the holder of the scrip is fatal to the claim that there was an equitable assignment. *Hoyt* v. *Story*, 3 Barb. 262; *Christmas* v. *Griswold*, 8 Ohio St. 563; *Ford* v. *Gardner*, 15 Ind. 293; *Ford* v. *Angelrodt*, 37 Mo. 57; *Powers* v. *Wheaton*, 22 id. 182; *Christmas* v. *Russell*, 14 Wall. 70; *Trist* v. *Child*, 21 U. S. 447; *Hosack* v. *Rogers*, 18 Wend. 319; *Geist's Appeal*, 104 Pa. St. 355.

If these officers had not power to issue the scrip, they had not power to bind the company by recitals contained in the scrip. 2 Morawetz on Corp. secs. 587, 589; 1 id. secs. 340, 341, 537, 540; *Hall* v. *Road Co.* 70 Ill. 676; *Manufacturing Co.* v. *People*, 82 id. 457; *McCullough* v. *Moss*, 5 Denio, 567; Cook on Stockholders, secs. 716, 726; *Titus* v. *Railroad Co.* 37 N. J. L. 98; *Mine Co.* v. *Bank*, 39 Mich. 644; *Kalamazoo* v. *McAllister*, 36 id. 329; *Mayor* v. *Railroad Co.* 4 Ellis & Bl. 443; Waterman on Specific Per. sec. 126, p. 443; *People's Bank* v. *Church*, 109 N.Y. 512; 3 Pomeroy's Eq. Jur. sec. 1305, and notes, sec. 1203; *Adams* v. *Crosswood P. Co.* 27 Ill. App. 313; *Railroad Co.* v. *Ashling*, 34 id. 99.

A scripholder cannot represent the corporation. Facts must be alleged in the bill showing clearly that a complainant occupies a representative capacity before he can

ask relief by or through a corporation. *Stokes* v. *Riley*, 121 Ill. 167; *Carter* v. *Treadwell*, 3 Story, 25; *Stanton* v. *Railway Co.* 4 Ry. Corp. Cas. 370; *Heath* v. *Railway Co.* 8 Blatch. 348; *Thomas* v. *Hoblet*, 4 DeG., F. & J. 199; *Walburn* v. *Ingleby*, 1 M. & K. 61; *Burrall* v. *Railway Co.* 75 N. Y. 211; *Mayer* v. *Railway Co.* 38 Fed. Rep. 197.

It would be a misjoinder of causes of action, and objection thereto can be made at any time. *Bell* v. *Carlton*, 2 M. & K. 503; *Carter* v. *Treadwell*, 3 Story, 25; *Stokes* v. *Riley*, 121 Ill. 167; *Stanton* v. *Railway Co.* 4 Ry. Corp. Cas. 370.

A claim to redeem stock from Blodgett can not be joined with a demand to call the officers and creditors of the corporation to account. *Stanton* v. *Railway Co.* 4 Ry. Corp. Cas. 370; *Hersey* v. *Veazie*, 24 Me. 9; *Thomas* v. *Hoblet*, 4 DeG., F. & J. 199; *Bell* v. *Carlton*, 2 M. & K. 503; *Greenwood* v. *Churchill*, 1 id. 559; *Stokes* v. *Riley*, 121 Ill. 166; 3 Pomeroy's Eq. sec. 1095.

One must be a legal stockholder in the corporation before he can act through it or on its behalf. *Heath* v. *Railway Co.* 8 Blatch. 348; 1 Morawetz on Corp. secs. 109, 170, 191, 483, 189, 485; *Ex parte Wilcox*, 7 Cow. 402; *State* v. *Leete*, 16 Nev. 242; *Walburn* v. *Ingleby*, 1 M. & K. 61; *Brown* v. *Adams*. 5 Biss. 181; *Otis* v. *Gardner*, 105 Ill. 438; *Bank* v. *Gridley*, 91 id. 457; *Hersey* v. *Veazie*, 24 Me. 9; *Upton* v. *Haines*, 55 N. H. 285; Thompson on Stockholders, secs. 177, 178; *Stanton* v. *Railway Co.* 4 Ry. Corp. Cas. 370.'

J. R. DOOLITTLE, for appellant the Rosehill Cemetery Company:

The promoters of a corporation are in no sense identical with the corporation. They have no power or authority to enter into preliminary contracts, binding the corporation when it shall come into existence. *Screw Co.* v. *Cousley*, 72 Ill. 531; *Railroad Co.* v. *Sage*, 65 id. 328; *Holder* v. *Railroad Co.* 71 id. 106; *Loan Ass.* v. *Stonemetz*, 29 Pa. St. 534; *Railroad Co.* v. *Echternacht*, 21 id. 222; *Railroad Co.* v. *Ketcham*, 27 Conn. 170; Angell & Ames on Corp. 255; *Cole-*

*man* v. *Railroad Co.* 38 N. Y. 201; *Insurance Co.* v. *Hart*, 31 Md. 59; *Gridley* v. *Railway Co.* 71 Ill. 201.

One dealing with officers of a corporation is bound to take notice of the limit of their authority. *Alexander* v. *Caldwell*, 83 N. Y. 480; *Railroad Co.* v. *Bowser*, 48 Pa. St. 29.

A mere personal or corporate agreement, though of the clearest and most solemn kind, to pay a debt out of a particular fund, is not an assignment of the fund, even in equity. *Christmas* v. *Russell*, 14 Wall. 70; *Trist* v. *Childs*, 21 id. 441; *Christmas* v. *Griswold*, 8 Ohio St. 558; *Hosack* v. *Rogers*, 18 Wend. 319; *Hoyt* v. *Story*, 3 Barb. 262; *Benford* v. *Sanner*, 40 Pa. St. 9.

BEAM & COOKE, and EDWARD D. COOKE, for appellant the National Life Ins. Co.

OSBORNE BROS. & BURGETT, and ROBERT F. PETTIBONE, for appellees :

Appellees are the equitable owners *in præsenti* of the stock or interest in the company, represented by their certificates, and equity will make that ownership effectual. The original transaction was lawful, and by it, when consummated, Benson became the owner of the whole interest in the company represented by all the certificates. *Insurance Co.* v. *Osgood*, 93 Ill. 69; *Insurance Co.* v. *Manufacturing Co.* 97 id. 537; *Bouton* v. *Dement*, 123 id. 142; *Winston* v. *Paving Co.* 129 id. 64; *Stewart* v. *Railroad Co.* 41 Fed. Rep. 736; *Railroad Co.* v. *Tiernan*, 37 Kan. 606; *Foster* v. *Seymour*, 23 Fed. Rep. 65; *Lorillard* v. *Clyde*, 86 N. Y. 384; *Brant* v. *Ehlen*, 59 Md. 1; *Horse Nail Co.* v. *Linden Spring Co.* 142 Mass. 349; *In re Ambrose, etc. Co.* L. R. 14 Ch. Div. 390; *Parsons* v. *Hayes*, 14 Abb. N. C. 419; *Walburn* v. *Chenault*, 43 Kan. 352; 1 Morawetz on Corp. sec. 290; *Langdon* v. *Fogg*, 18 Fed. Rep. 5; *Scovill* v. *Thayer*, 105 U. S. 143; *Waterhouse* v. *Jamieson*, L. R. 2 H. L. 29; *Currie's case*, 3 DeG., J. & S. 367; *Carling H. & W. cases*, L. R. 1 Ch. Div. 115; *Sawyer* v. *Hoag*, 17 Wall. 610; *New*

*Albany* v. *Burke,* 11 id. 96 ; *Burke* v. *Smith,* 16 id. 390 ; *Bank* v. *Alden,* 129 U. S. 373 ; *Coit* v. *Gold Amalgamating Co.* 119 id. 343 ; Cook on Stockholders, secs. 37-44, 52, 53, and cases cited ; *Upton* v. *Tribilcock,* 91 U. S. 45 ; *Brigham* v. *Mead,* 10 Allen, 245 ; *Railroad Co.* v. *Dudley,* 14 N. Y. 336 ; *McLaughlin* v. *Railroad Co.* 8 Mich. 100 ; *Hough* v. *Land Co.* 73 Ill. 23 ; *Otis* v. *Beckwith,* 49 id. 121; *Harris* v. *Cornell,* 80 id. 54; *Road Co.* v. *People,* 115 id. 133.

The land was the capital stock, and the fixing of the valuation of the land or capital stock was a mere estimate.    *Lorillard* v. *Clyde,* 68 N. Y. 384 ; *Stewart* v. *Railroad Co.* 41 Fed. Rep. 736 ; *Railroad Co.* v. *Tiernan,* 37 Kan. 606 ; *Foster* v. *Seymour,* 23 Fed. Rep. 65 ; *Brant* v. *Ehlen,* 59 Md. 1; *Parsons* v. *Hayes,* 14 Abb. N. C. 419 ; *Walburn* v. *Chenault,* 43 Kan. 352 ; 1 Morawetz on Corp. sec. 290 ; *In re Ambrose, etc. Co.* L. R. 14 Ch. Div. 390 ; *Bank* v. *Alden,* 129 U. S. 373 ; *Coit* v. *Gold Amalgamating Co.* 119 id. 343 ; *Coffin* v. *Ransdell,* 110 Ind. 417; *Dupont* v. *Tilden,* 42 Fed. Rep. 87.

It was the intention, in good faith, of all the parties to the transaction, that the ownership of the stock or beneficial interest in the company should pass to Benson in exchange for the property, on the delivery of the deeds. *Otis* v. *Beckwith,* 49 Ill. 121; *Leavers* v. *Cleary,* 75 id. 349 ; *Wilson* v. *Roots,* 119 id. 379 ; *Insurance Co.* v. *Olcott,* 97 id. 439.

This was the uniform construction by the company and all concerned.    *Storey* v. *Storey,* 125 Ill. 608 ; *Vermont Street Church* v. *Brose,* 104 id. 206.

The certificates of conditional scrip represent the equity in the Blodgett interests, and the owner of them is the owner of that equity.    *Ex parte Barber,* 3 M., D. & DeG. 174; 3 Pomeroy's Eq. sec. 1282 ; *Padfield* v. *Padfield,* 72 Ill. 322 ; *Kekewich* v. *Manning,* 1 DeG., M. & G. 176 ; *Otis* v. *Beckwith,* 49 id. 121; *Ellison* v. *Ellison,* 6 Ves. Jr. 656 ; *Wheatley* v. *Purr,* 1 Keen's Ch. 551.

The company is estopped by the certificates from denying the equitable ownership of appellees.    *Holbrook* v. *Zinc Co.* 57 N. Y. 616 ; *Railroad Co.* v. *Schuyler,* 34 id. 30 ;

*Leitch* v. *Wells*, 48 id. 585 ; *McNeil* v. *Bank*, 46 id. 325 ; *Bank* v. *Lanier*, 11 Wall. 369 ; *Case* v. *Bank*, 100 U. S. 446 ; *Johnson* v. *Laflin*, 103 id. 800 ; *Bruff* v. *Mali*, 36 N. Y. 200 ; *Tome* v. *Railroad Co.* 39 Md. 36 ; *Titus* v. *Turnpike Co.* 61 N. Y. 237; *Railroad Co.* v. *Bank*, 60 Md. 36 ; *Bank* v. *Field*, 126 Mass. 345 ; *Bank* v. *Bank*, 1 Parson's Sel. Cas. 180; *In re Railroad Co.* L. R. 3 Q. B. 584; *Shaw* v. *Railroad Co.* L. R. 13 id. 103 ; *Railroad Co.* v. *Larned*, 103 Ill. 293 ; *Shaw* v. *Bank*, 101 U. S. 557.

The certificates, as evidences of equitable ownership, will be made effectual by a court of equity. *Kekewich* v. *Manning*, 1 DeG., M. & G. 176 ; *Otis* v. *Beckwith*, 49 Ill. 121; *Ellison* v. *Ellison*, 6 Ves. Jr. 656 ; *Wheatley* v. *Purr*, 1 Keen's Ch. 551; *Burr* v. *Wilcox*, 22 N. Y. 551; Cook on Stockholders, sec. 10.

Without reference to original issuance, the certificates are valid by acquiescence and ratification. *Hall* v. *Fullerton*, 69 Ill. 448 ; *Oil Co.* v. *Marbury*, 91 U. S. 592 ; *Badger* v. *Badger*, 2 Wall. 87; *Harwood* v. *Railroad Co.* 17 id. 78 ; *March* v. *Whitmore*, 21 id. 178 ; *Vigers* v. *Pike*, 8 Cl. & Fin. 650 ; *Follansbee* v. *Kilbreth*, 17 Ill. 522 ; *Wentworth* v. *Lloyd*, 32 Beav. 467; *Gold Mining Co.* v. *Bank*, 96 U. S. 640 ; *Law* v. *Cross*, 1 Black, 533 ; *Connett* v. *Chicago*, 114 Ill. 233 ; *Rolling Mill* v. *Railroad Co.* 120 U. S. 256 ; *Wood* v. *Whelan*, 93 Ill. 153 ; *Stewart* v. *Railroad Co.* 41 Fed. Rep. 736 ; *Railroad Co.* v. *Tiernan*, 37 Kan. 606 ; *Lorillard* v. *Clyde*, 86 N. Y. 384; *Insurance Co.* v. *Osgood*, 93 Ill. 69.

The claim by the creditors for compound interest should be disallowed in the present accounting. Rev. Stat. chap. 74, secs. 5, 6, 7, 11; *Leonard* v. *Villars*, 23 Ill. 322 ; *Jenkins* v. *Greenbaum*, 95 id. 11; *Van Benschooten* v. *Lawson*, 6 Johns. Ch. 313.

CARTER, J.: Appellee Lansingh, as administrator *de bonis non* of the estate of John Dempster, deceased, claiming to be the owner and holder of three certificates of conditional scrip issued by the Rosehill Cemetery Com-

pany, amounting in the aggregate, at their face value, to $19,000, filed his bill of complaint in the circuit court of Cook county, on behalf of himself and of all other holders of the conditional scrip of said company who should come in, etc., against the appellants, Van H. Higgins, Henry W. Blodgett, the Rosehill Cemetery Company, and others, to redeem 937 shares of the capital stock of the cemetery company held by Blodgett in pledge, as collateral security for the payment of a mortgage debt of one Benson, which was a lien on the real estate of and had been assumed by the company, and for an accounting, and for other relief. The original bill was filed December 9, 1882, to which a demurrer was sustained, and after various amendments, and after answers filed, an amended and supplemental bill was filed October 23, 1885. Answers and replication having been filed, and the master to whom the cause had been referred to take the testimony having reported, the cause was heard on the evidence thus taken, and upon depositions, and upon oral and written proofs adduced in open court, and a decree was made by the chancellor on July 15, 1887, finding the equities for the complainant and intervening petitioners, and that they were entitled to redeem said shares of stock; that an accounting should be had to ascertain whether or not the debt for which the shares were pledged had been paid, and if not, how much remained due, and fixing the basis of such accounting. The master having proceeded with the accounting under the decree, and after having taken evidence relating thereto, the defendants, on June 24, 1890, filed their petition, stating to the court that on the basis as fixed by the court in the decree, the debt for which the shares were pledged had been fully paid, and asked the court to suspend the taking of the account, and to require the master to return into court the testimony, exhibits and accounts. The order was made according to the prayer of the petition, and the cause set for and final hearing had. Final decree was

rendered in favor of the complainant and intervening petitioners October 30, 1890. The defendants appealed, and the Appellate Court for the First District being divided in opinion, the judgment was affirmed by operation of law, from which judgment of affirmance the defendants took this appeal to this court.

The pleadings, proofs and arguments are exceedingly voluminous, and their substance cannot be stated within any reasonable limits of space or time. Appellants alone, by their several counsel, have filed considerably more, in the aggregate, than a thousand pages of printed briefs and arguments, and cited many hundreds of authorities. The principal facts, and the contentions of the parties in reference thereto, and the law applicable to them, will be stated, as fully as time or space will permit, as the several branches of the case to which they relate are considered.

In the spring of 1857, Francis H. Benson purchased of Henry W. Blodgett, W. S. Johnson, S. F. Johnson and John S. Newhouse a tract of land in the town of Lake View, a few miles north of the city of Chicago, and for the deferred payments thereon gave his notes for $35,568, secured by a mortgage to Newhouse upon the premises. He also purchased, about the same time, of the Illinois and Wisconsin Land Company, another piece of land adjoining the former, all together constituting what was known as the town of Chittenden, excepting certain lots which had been previously sold to others. For the latter tract he paid $25,140,—$5028 in cash, and the balance, $20,112, in notes, secured by mortgage to Henry Smith, John Felton and Reuben E. Deming, trustees of the Illinois and Wisconsin Land Company, afterwards called the Boston mortgage. The Newhouse mortgage bore date April 23, 1857, and each of the four sellers of that portion of the land held one-quarter in amount of the notes secured thereby. Benson and his partner, Kingsbury, who were bankers, failed, and in October of the same year,

owing between $150,000 and $200,000, made an assignment to Beveridge and Moss for the benefit of their creditors. Kingsbury, though named as a party to the deed of assignment, did not, however, it seems, execute it. Benson and wife conveyed, as a part of the assignment, by separate deed, this land and other property to these assignees.

After the great financial panic of 1857, which occurred in the fall of that year, real estate, especially suburban property, declined very greatly in value, and these tracts, which had been bought by Benson at an inflated price, became reduced in their market value to but little beyond one-half of the purchase moneys for which they were mortgaged. There was then little or no market for such property. It seems, however, that from the nature and dryness of the soil, and from their location on the railroad, about seven miles north of the center of Chicago, they were especially adapted to the purposes of a cemetery, and might have a special value if devoted to that purpose. Nothing having been done with the lands or lots, (for they had been laid off and platted into town lots, with streets, etc., before the mortgage by Benson to Newhouse,) except the sale therefrom by Benson of a small quantity of gravel, Benson conceived the idea of forming a cemetery corporation and devoting the land to cemetery purposes. From correspondence and conferences with managers of cemeteries elsewhere, he became impressed with the belief that a large amount of money, sufficient to pay all his debts and to leave him a competency besides, could be realized from this land if used in this way. His creditors had held meetings and had authorized his assignees, by some writing spoken of by the witnesses but not produced in evidence, to allow him to manage the assigned property, and to trade and traffic with it, and out of it to pay his debts as best he could. He was wholly insolvent, but by promising to associate with him in the enterprise his former clerk, Sherman, he obtained from Sherman sufficient money to pay his

expenses at the State Capital while he secured the draft-
ing and passage of a special act of the legislature incor-
porating the cemetery company which he proposed to
organize. Thus the law incorporating the Rosehill Ceme-
tery Company was passed and came in force February 11,
1859. Benson had also, for reasons which he thought
would popularize his undertaking, and for assistance
rendered him, associated with him in the enterprise
Dr. Blaney, who was the first president, and was one of
the board of managers from the organization of the cor-
poration until his death, some time after 1872.

The charter provided that William B. Ogden and
twenty-two others named, including Benson, Blaney and
Sherman, and such others as they might thereafter asso-
ciate with themselves, should be and were constituted a
body politic and corporate, with perpetual succession,
etc.; that "they and their successors may have a common
seal, and make and alter the same at pleasure, and do such
other things as are incident to a corporation and not in-
consistent with the constitution of the State of Illinois;"
that the eighteen persons first named should constitute
the first "board of consultation," and the five last named,
which were, Blaney, Henry Smith, Judson, Jansen and
Benson, should be the first board of managers, and should
have power to receive subscriptions for the purchase of
property and for laying out and ornamenting the grounds
for cemetery purposes, and might issue certificates rep-
resenting the interests of subscribers in the property held
by the company and in the proceeds of the sale of burial
lots; that such individual interests should be personalty,
and the certificates assignable only in such way as the
managers should, from time to time, direct; that the man-
agers should have authority to call in such subscriptions,
in such payments, at such times or in such installments,
as deemed proper, and to compel payment by forfeiture
or sale, if necessary, of the interest of the delinquent
subscriber; that it should be lawful for the managers to

receive, at their option, such real estate or personal property, at an equitable valuation, as they might deem available for the purposes of the company, and to obtain and hold possession of real estate situated in the town of Lake View, not exceeding five hundred acres, by purchase, exchange or otherwise, for cemetery purposes. The charter also provided that the managers might make a plat of such grounds and additions as they might acquire, and the recording thereof in the recorder's office should operate as a legal vacation of any former plat or subdivision of the same, and of any roads, streets or alleys passing through the same. There were various other provisions relating to laying out and ornamenting the grounds, and protecting and caring for graves and monuments, exempting the grounds from taxation, etc., not having any bearing on this case.

The company was organized, with the officers stated, during February, 1859, and there can be no doubt, from the evidence, that it was organized and its charter obtained for the primary purpose of devoting these lands to cemetery purposes, and of selling them out in burial lots, for profit. Benson, acting for himself and his assignees, as well as for the cemetery company after it was organized, arranged to have the lands conveyed to the latter. The conveyance was accordingly made by the assignees and Benson and his wife, all joining, by means of five deeds, the first bearing date April 22, 1859, reciting a consideration of $2000; the second dated April 26, 1859, reciting a consideration of $1000; the third dated April 27, 1859, reciting a consideration of $8000; the fourth bearing the same date and reciting a consideration of one dollar; and the fifth bearing the same date and reciting a consideration of $2000, the receipt of which consideration in each conveyance, it is stated, is thereby acknowledged and the party of the second part forever discharged from the payment thereof. By these conveyances the cemetery company expressly assumed and

agreed to pay the encumbrances then existing upon the property for unpaid purchase money, including the Newhouse mortgage and the Boston mortgage, then amounting, with interest, to about $59,000, and further assumed all outstanding contracts for the conveyance of lots which had been previously sold by Benson or his grantors. The deeds also expressly conveyed to the company Benson's reversionary interest in the streets and alleys and parks adjoining the lots and blocks, which he had previously included in the mortgage to Newhouse, but which seem not to have been embraced in his deed to the assignees. It appears that these deeds were made and acknowledged in advance of any action taken by the board of managers, as the first mention of the subject in the records of the company is found in the meeting of April 30, when a committee was appointed to confer with the assignees for the purchase of Benson's interest in the property, and to report the conditions on which such purchase could be made. It is noticeable, also, that many subsequent acts of the company were authorized of record after the acts themselves had been consummated.

It seems to have been understood, in advance of the incorporation, between Benson and those interested with him in the enterprise, that the capital stock should be $150,000, which was about the amount of Benson's indebtedness, and that it should be divided so that Benson should have $115,000, Blaney $20,000 and Sherman $15,000, and after the company was organized it was discussed among the managers and officers, and understood and acquiesced in, without objection from any one, that Benson was entitled to the stock for what was called "his equity," though no express order to that effect was made. Blaney and Sherman received their shares because Benson had promised they should receive them for the considerations before mentioned. The charter made no mention, in terms, of capital stock, nor fixed any limit to the amount of the certificates of interest authorized to be

issued, but at meetings of the managers held in April and May, 1859, the capital stock was fixed at $150,000, in shares of $100 each, and a form of certificate was adopted which contained the clause, "each share being one undivided fifteen-hundredth part of all the estate of said company, subject to the provisions of the charter and the by-laws of the corporation, transferable only on the books of the company," and providing further that no assignment of the certificate should take effect until made on the books of the company, the assigned certificate returned and a new one issued to the assignee. It was also ordered that the capital stock should not be increased or altered except by a five-eighths vote of all the stock, at a stockholders' meeting called according to the by-laws. It was also then ordered that "the president and treasurer be authorized to issue stock to the amount of not more than $150,000, in such parcels as the parties who may be entitled to the stock may direct, and report the issues to the board, from time to time, as made." It was arranged between the cemetery company and the holders of the Newhouse debt against Benson, which the company had assumed, that the debt, then amounting to $36,968, should be extended five years, to April 23, 1864, and the interest increased to ten per cent, and that bonds of the company for that amount, with interest coupons, should be issued, secured by deed of trust, on about forty acres of the land released from the Benson mortgage, and delivered to the defendant Blodgett in trust, as collateral security for the Newhouse debt. The trust deed ran to Blodgett as trustee, and provided for the sale of the forty acres in burial lots, and to be conveyed by the trustee as sold, one-half of the proceeds to be paid to the company and the other half on the debt. Benson was not released from the indebtedness, but the same was expressly kept alive against him, the trust deed reciting that the extension of time and increase of interest were made by stipulation with him. The bonds also purported

to pledge the income, property and franchises of the company for their payment.

About the same time, and as a part of the same transaction between the company, Benson and the holders of the Newhouse debt, certificates for 937 shares of the capital stock were ordered to be, and were, issued by the company and delivered to Blodgett, trustee, in pledge, as further collateral security for the debt, and Blodgett gave the following receipt therefor, which was approved by the board:

"Received, Chicago, May 27, 1859, of the Rosehill Cemetery Company, certificates for 937 shares of the capital stock of said company, which said stock is to be held by me as collateral security for the payment by F. H. Benson to John S. Newhouse, S. F. Johnson, W. S. Johnson and myself of the sum of $36,968 on the 23d day of April, A. D. 1864, with annual interest thereon at ten per cent per annum, each of said persons holding one-fourth of said indebtedness in severalty, the said interest being payable on the 23d day of April in each year; and in case the said Benson or said Rosehill Cemetery Company shall fail or neglect to pay said interest, or any part thereof, as the same accrues, or in case of failure to pay said principal sum, or any part thereof, at the time the same shall become due, then I am authorized to sell and dispose of said stock, or any part thereof as may be necessary, either at public or private sale, at my election, after giving ten days' notice of the time and place of such sale in some daily newspaper published in the city of Chicago, and apply the proceeds of such sale, and after deducting the necessary expenses and commissions incident thereunto, toward the payment of said indebtedness. It being understood that the whole of said indebtedness is to become due, at the election of the holders thereof, upon default in the payment of said interest, or any part thereof. It being understood and agreed that during the time I shall so hold said stock as collateral, I or my executors,

154—21

administrators, or any attorney or attorneys by me author-
ized, shall have the right to vote upon the same at all
meetings of the stockholders of said company, having
one vote for each share; and I agree that upon a full and
complete payment of said indebtedness I will surrender
said stock to said company or assigns, and transfer the
same to whomsoever it may request.   It being further
understood, that in case said stock, or any part thereof,
shall be offered for sale by reason of default in the pay-
ment of said interest or indebtedness, the holders of said
interest or indebtedness may become purchasers, and
whosoever may become purchasers of said stock, or any
part thereof, at such sale, shall hold the same absolutely
as against the said company and all persons claiming
under it.                          H. W. BLODGETT."

By this arrangement Blodgett, representing the cred-
itors holding the Newhouse debt, was given five-eighths
of the voting power in the meetings of the stockholders.
Arrangements were also made with the Illinois and Wis-
consin Land Company, whereby portions of the land
bought of it were released from the old trust deed and
conveyed to Henry Smith, as trustee, upon trusts similar
to those in the Blodgett trust deed, but securing the pay-
ment of the land company debt.   The land so conveyed
in trust to Blodgett and to Smith was inclosed into a
cemetery, and the sale of lots and burials commenced.
None of the stock was, however, pledged for the payment
of the debt of the land company.

At a meeting of the managers November 2, 1859, Blaney,
who had previously been appointed for that purpose,
presented two forms of scrip, which were adopted.   First,
a form certifying that ".... is entitled to .... payable in
the stock of the company at par, when presented, in sums
of $100," called in the record "absolute scrip;" and second,
a form called "conditional scrip," and when issued, as

most of it afterwards was, in certificates of $5000 to Benson, read as follows:

"No......... Office of Rosehill Cemetery Company, Chicago, Ill., November 5, 1859:

"Whereas, 937 shares of the capital stock of the Rosehill Cemetery Company is deposited with Henry W. Blodgett, Esq., of Waukegan, Ill., which said stock is to be returned to the said company on the performance by said company of certain conditions, which are fully set forth in the receipt for said stock given by said Blodgett to said company on the 26th day of May, 1859, which said receipt is on file in the office of the treasurer of said company:

"Now, therefore, be it known, that F. H. Benson is entitled to the sum of $5000, payable in the said stock held by said Blodgett, as aforesaid, at par, at any time after the said stock shall again come into the possession of the said Rosehill Cemetery Company, when presented, in sums of $100. This certificate is transferable by endorsement.

"In witness whereof, the president and treasurer of said company have hereunto affixed the corporate seal of the company, and subscribed their names, at the city of Chicago, Illinois, on the fifth day of November, 1859.

JAS. V. Z. BLANEY, *Pres.*,

J. WOODBRIDGE SMITH, *Treas.*"

At the same meeting "the president and treasurer were ordered to issue to F. H. Benson $115,000, Jas. V. Z. Blaney $20,000, A. T. Sherman $15,000, ($150,000) of the scrip in this company, in such parcels as the parties may desire." While there is some evidence tending to show that a slight excess over $150,000 in stock and scrip was issued, we think it appears, from the whole evidence, that not more than that amount was ever issued and outstanding at any one time, and that the company did not intend to authorize to be issued, and did not issue, aside from the

preferred stock mentioned hereafter, any more than the
$150,000 of stock and scrip together. It is not always
easy to determine from the books of the company whether
reference is made to stock or scrip, as in most instances
stock and scrip are mentioned indiscriminately as stock.
The conditional scrip shows on its face that it relates to
the 937 shares issued to Blodgett, and the absolute scrip
was doubtless intended to evidence the right of the holder
to the amount of stock called for by it out of the remain-
ing 563 shares.

The company had no property or means except the
land conveyed to it by Benson and his assignees and what
it received from the sale of burial lots. For many years
it had a hard struggle for existence, and would doubtless
have failed altogether had not the holders of the New-
house debt, after the first year, allowed it to retain the
whole of the proceeds of the sales of lots instead of only
one-half, as provided in the deed of trust, and allowed
their debt, principal and interest, to remain unpaid. They
also, including Blodgett, the trustee, assisted it with loans,
which it could not then repay. Benson, from time to time,
disposed of the stock and scrip issued to him, in paying
his debts and in other ways, but remained in the em-
ploy of the company, as superintendent, or in some other
capacity, until 1864 or 1865, and continued to be one of the
managers of the company until about the year 1867, when
he left it, claiming he had been "frozen out by the cred-
itors," and the three certificates of conditional scrip de-
scribed in and relied on in the bill of complaint, two
for $5000 each and one for $9000, were found among the
papers of plaintiff's intestate,—the two issued to Benson
and endorsed by him in blank, and the other issued to
deceased himself, but also endorsed by Benson. Demp-
ster, the deceased, had been a creditor of Benson, but the
amount of his debt is not shown.

Many of the certificates of scrip as well as of stock
were destroyed in the great Chicago fire of 1871 or in

other ways, and on proof being made were re-issued by the company at different times, even as late as 1882, when certificates for $5100 of stock were issued to appellant Higgins, who now claims to be the chief owner of all beneficial interests in the company and denies the validity of the scrip. The board of managers adopted a standing order for such re-issue. In 1876, after Higgins became one of the managers and the holder of the greater part of the indebtedness of the company, and was practically in control, a petition to the board, showing that three certificates of conditional scrip issued to Benson had been destroyed by the great fire and asking for their re-issue, was referred to the officers with power to act, who afterwards re-issued them as prayed. The certificates of scrip as well as of stock were bought and sold among the managers, officers and creditors of the company, and transferred on the books of the company, for more than twenty years before this suit was brought, without their validity being questioned. The company never took any action to call in or repudiate these certificates, nor indicated in any way, by its official proceedings, that they were invalid or had been issued without consideration.

In July, 1872, at a meeting of the managers, the Newhouse debt, principal and interest, remaining unpaid, except $3334.35, which had been paid to the holder of one of the quarter interests, was re-adjusted between the then holders of it and the company. There appears to have been due upon the principal of the Newhouse debt, when it matured in 1864, $33,633.65, and also the accrued interest. At this settlement in 1872 the interest was compounded, and the total amount due was fixed at $119,023.39. New bonds of the company, payable in ten years, with interest at ten per cent, were given in lieu of the bonds of April 23, 1859. It was provided in the resolution adopted by the managers, that these new bonds so issued "shall be taken as conclusive evidence of the amount of the indebtedness of the said Benson and ceme-

tery company to said parties in interest under said mortgage." Other considerations entered into this settlement, which will be noticed at another place.

Higgins had purchased a one-quarter interest in this debt in 1871, and had contracted with one of the managers for another quarter shortly before the settlement, and by other purchases, made later, obtained control of the rest of the debt as well as of the Boston mortgage and other indebtedness of the company. He also became the owner of substantially all of an issue of $25,000 of "preferred stock," hereafter considered, and of a portion of the common stock and scrip which had originally been issued to Benson and others. He was .elected one of the managers in January, 1873, and treasurer in July, 1878, holding both of these offices at the beginning of this suit, and owning or controlling substantially all financial interests in the corporation except the scrip and stock in the hands of the complainant and intervening petitioners.

Blodgett had, in 1866, sold and transferred, for about one-fourth its face value, his interest in the Newhouse debt, for which debt he held, as trustee, the bonds and 937 shares of stock of the company as collateral, including in such sale his demands on the company of upwards of $1000 for money loaned, and thereafter he had no interest in the company or its indebtedness except as trustee, holding said stock and other securities under the trusts created, when they were placed in his hands. He was, however, elected manager at a stockholders' meeting in November, 1862, and continued to act as such thereafter. He voted the stock in his hands at the stockholders' meetings, as it was his right and duty to do, but it would seem that he also recognized Benson's equity by associating Benson with him in voting the 937 shares at this meeting when he was elected manager. Benson also, at this meeting and others, voted the shares of stock issued to and retained by him without question or objection by Blodgett or any one. We think, also,

that as stockholder holding in trust and voting five-eighths of the capital stock, and as manager for more than twenty years, dating back to within less than three years of the incorporation of the company, Blodgett was charged with notice of the orders of the board for the issue, and of the issuing by the officers, of the rest of the $150,000 of stock not issued to him, and of the scrip also, and that there was no other consideration for such issue except Benson's equity in the land.

By means of this stock pledged to Blodgett, the creditors elected managers satisfactory to themselves whenever vacancies occurred,—Blodgett, J. Woodbridge Smith, Newhouse, Turner, Higgins and others, all creditors, at some time, of the company, holding the position of manager ; and in this manner they acquired as complete control of the corporation as any stockholder holding a majority of the shares of stock could lawfully acquire of any corporation. The company's debts were not paid, but were increased by adding interest to principal and issuing new evidences of such debts, and by the purchase of additional lands at high valuations, and by making expensive improvements, until, from an original indebtedness of less than $60,000, it ran up to nearly half a million dollars when this bill was filed. Many of these things were, however, shown to have been beneficial to the company. It was necessary to its success that expensive improvements should be made, as thereby the sales of lots were increased four-fold ; that extensions of its indebtedness should be secured, foreclosure of mortgages avoided, and perhaps that additional lands should be obtained, and it is apparent from the evidence that many of the acts of the managers and officers complained of by appellees as unduly increasing the indebtedness of the company, were necessary to save it from complete insolvency and failure. A foreclosure, at any time, of the mortgages and trust deeds, or of the pledge of the stock, would have effectually destroyed all value

of the conditional scrip, on which the bill in this case is predicated.

The complainant testified that he applied to several of the managers, and requested that action be taken to compel an accounting by Higgins and for redemption of the stock pledged to Blodgett, claiming that on a proper accounting it would be found that the debt was paid and the pledge ended. In a conversation with Higgins on the subject, Higgins told him he had better file his bill and he would make his account to the court, and that unless he did so soon he would have the stock pledged to Blodgett sold. Blodgett also informed him that unless enjoined he would advertise and sell the stock on Higgins' request. Blodgett did advertise the stock for sale by virtue of the conditions of the pledge, but upon the filing of the bill the sale was enjoined. No request or demand was made on the corporation or board of managers, as such, to bring suit or to take any action in the premises, and it is one of the contentions of appellants that the complainant had no right to bring suit on behalf of the corporation or to represent it in any way in enforcing its rights against its creditors or officers. But it is apparent that if the holders of the conditional scrip are the equitable owners of the stock pledged to Blodgett, subject to the lien thereon to secure the payment of the Newhouse debt, they had a right to redeem it, by paying the debt, at any time after it became due, and in such case the suit would be on behalf of themselves, and not of the corporation. The first question, therefore, presented for decision is, what are the rights of the holders of the conditional scrip?

The learned chancellor who tried the cause below held that these scripholders were equitable assignees of the stock in Blodgett's hands, subject to the pledge, and were entitled to the same, in proportion to the scrip held by them, when the debt is paid; that the certificates of scrip operated as equitable assignments *pro tanto* of this

pledged stock, and that therefore complainant was enti-
tled to bring his bill to redeem.   Appellees, while insist-
ing, as we understand counsel, that these certificates may
be regarded as equitable assignments of the stock, also
insist that they have yet a higher character, and may be
regarded as declarations of trust, or, rather, as written
declarations of the interest or equity which the holders
have in the Blodgett stock.   Appellants contend, on the
other hand, that they are mere executory agreements,
and that the company thereby merely undertook to pay
the holders the amount called for by the scrip, out of the
pledged stock, at par, when the Newhouse debt should
be paid and the stock returned to the company.   They
also contend they were issued without any consideration
paid to the company therefor; that they were fraudu-
lently issued, and were issued in violation of law, and
are absolutely void.

We are unable to agree with counsel for appellants on
this branch of the case.   It is clear, from the evidence,
that Benson was the owner of the lands and lots, subject
to the mortgage debts, until he conveyed them to his
assignees for the benefit of his creditors, and that he
remained the equitable owner of them, subject to the pay-
ment of his debts, his assignees being merely the holders
of the legal title, and his agents to distribute his assets
among his creditors.   (*Harris* v. *Cornell*, 80 Ill. 54; *Kirk-
land* v. *Cox*, 94 id. 400; *Bouton* v. *Dement*, 123 id. 142.)   It is
equally clear that he conceived the idea of creating a
special value for these lands and lots by devoting them
to the purposes of a cemetery, through the instrumental-
ity of a cemetery corporation, with the consent of his
assignees and his secured and unsecured creditors.   This
idea was carried out, the corporation was formed, he
secured the consent of his assignees and creditors, and the
lands and lots, including Benson's equitable interests
and his reversionary interests in the streets vacated by
force of the charter, were conveyed to the corporation.

The company paid nothing, unless the stock and scrip be regarded as payment. It is true, the company assumed the mortgage debts; but it had no other capital whatever, and could pay the debts only out of the proceeds of the sale of the property when sold out in lots at the increased value which its devotion to this special use gave it. Benson was not released from the mortgage debts, but they were expressly kept alive against him, the rate of interest was increased, and the holders could have shared equally with the unsecured creditors in any other assets of his estate. True, the property could not then have been sold in the market for much more than half enough to pay the debts for which it was mortgaged. But it was no part of the proposed scheme to sell it at its then market value. It appeared to be to the interest of both the secured and unsecured creditors to avoid such sale and to carry out Benson's plan, which, as he then conceived, would, if successful, enable him to pay all his debts in full. If Benson's equity in the property had no real or market value, neither did the stock or scrip, and had he got all of the stock and scrip he would have received no more than he procured to be conveyed to the company. If the mortgage creditors preferred to extend the time for the payment of their debt, obtain an increase of interest, take as collateral the bonds of the company and 937 shares of its capital stock, it was doubtless because they thought it was to their interest to do so. If the unsecured creditors preferred to give up any right they might have by the assignment to share in any possible surplus which might be derived from the sale of the property, and take their chances of obtaining from Benson payment in stock, or otherwise, it was doubtless because it was to their interest to do so. If Benson, his assignees and all of his creditors were agreed in the matter, who was there to object, or to be injured or defrauded? Surely those of the appellants who are defending this suit as creditors succeeding to the interests of

the original mortgage creditors cannot be heard to complain, when one of the purposes of the suit is to pay off their debts.

But counsel insist that the corporation was defrauded; that Benson, Blaney and Sherman, being a majority of the board of managers, voted the issue of the capital stock and scrip to themselves without paying the company anything for it and in fraud of the rights of the company, and that such stock and scrip are therefore void. The evidence shows that no deception was practiced on any one. There was no concealment; no pretence of any payment to the company, otherwise than by what was called Benson's equity in the land; no pretence that the company had any other capital. No one was beguiled into becoming a subscriber to the capital stock, or a creditor of the company, on the supposition that Benson paid anything more than he actually did pay. What was done was done openly, and, so far as the evidence discloses, honestly. The company obtained through Benson all the capital it had, and gave no more in return than it received. Had there been, at the time, other stockholders who had paid for their stock, or creditors, who had been injured by the transaction and not consenting thereto, then, as to them, counsel's argument would be unanswerable. But in passing on this branch of the case we must regard the company as a mere instrumentality by which the plan of Benson and his creditors was carried into effect. If instead of forming a corporation they had conveyed this land to a trustee, clothing him and his successors with power similar to that contained in the charter, as fully as it could be done without an act of the sovereign power of the State, to devote these lands to cemetery purposes, it would have been no fraud on the trustee to obtain from him certificates showing that all beneficial interests in the proceeds of the sale of burial lots belonged to Benson and his creditors. Before the conveyance to the company, whatever

value the lands had, then or prospectively, belonged to Benson and his creditors, and they could have preserved their right to this value by any lawful means, and could have retained the beneficial interest in the proceeds of the sales of burial lots, in devoting the lands to cemetery uses. We cannot see why they could not, without any fraud on the company, where there was no one else to be injured, take from the company certificates of interest, or stock, (for the term is immaterial,) evidencing their interest in the corporation, or in the proceeds of sales of what had then become corporate property. It is the substance of the transaction that a court of equity must regard, and not the mere form in which the parties have clothed it.

The several counsel for appellants have argued at great length, and cited hundreds of authorities, in their endeavor to show that the stock and conditional scrip were fraudulently issued to Benson, and that therefore a court of equity will not grant any relief to the holders of it, who have no higher equities than Benson himself. It is not, and, as we understand the evidence, it cannot be correctly, maintained that there was any fraudulent intent or purpose, any deception, concealment, misrepresentation or imposition, by Benson, but the contention is, that in so obtaining the stock and scrip, as shown by the evidence, it amounted to a fraud upon the company itself, there being no one else to be defrauded. We are of the opinion that it was lawful for Benson, with the consent of his creditors, to devote these lands to the purposes of a cemetery through the instrumentality of this corporation, and, the lands being the only capital of the company, and there being then no other stockholders or creditors of the company to complain, to take and receive from the company certificates representing all of the capital stock, even though their face value was far beyond the value of the lands. It was a mere change from private to corporate ownership of the land.

In *Coffin* v. *Ransdell*, 110 Ind. 417, it was said: "Patent rights and mining and manufacturing property, which are embarked in enterprises, are frequently valued by their owners and others at a prospective value, which may or may not be realized, dependent upon future contingencies. If the owners, who put such valuation thereon, act in good faith, and yet suffer disappointment, we can see no reason why they should suffer further, unless they have been guilty of fraud or concealment which has resulted in damage to others." See, also, *Brant* v. *Ehlen*, 59 Md. 1; *New Haven Horse Nail Co.* v. *Linden Spring Co.* 142 Mass. 349.

In *Scoville* v. *Thayer*, 105 U. S. 143, in a suit to recover unpaid assessments, it was said: "The stock held by the defendant in error was evidenced by certificates of full-paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other stockholders, and the fact was known to all. As between them and the company this was a perfectly valid agreement. It was not forbidden by the charter of the company or by any law or public policy, and, as between the company and its stockholders, was just as binding as if it had been expressly authorized by the charter." See, also, *Bank of Fort Madison* v. *Alden*, 129 U. S. 372; *Flinn* v. *Bagley*, 7 Fed. Rep. 785; *Parsons* v. *Hays*, 14 Abb. N. C. 419.

In *Foster* v. *Seymour*, 23 Fed. Rep. 65, where the trustees of a corporation had delivered to themselves the stock in payment of their mining property, Mr. Justice WALLACE, of the Circuit Court of the United States for the Southern District of New York, said: "The corporation lost nothing by the transaction disclosed by the bill, except the paper which was created and called capital stock. None of its capital was diverted. The scrip was not capital stock. The capital stock of a corporation is the money or property which is put into a cor-

porate fund by those who subscribe for stock, and thereby agree to become members of the corporate body. Unless it represents capital contributed or agreed to be paid in, it has no value. (*Burrall* v. *Bushwick Railroad Co.* 75 N. Y. 216; *Sturges* v. *Stetson*, 1 Biss. 246.) The property it received in exchange for the scrip had some value—certainly as much as the scrip had. There was no fraud upon the corporation. At the time the scrip was exchanged for the mining property the trustees was all there was of the corporation. There were no stockholders unless *they* were the stockholders. What was done was done by the corporation. By the exchange the corporation got the mining property, and gave it back again to those from whom it got it, divided into 100,000 shares, of the nominal value of $100 each."

In *Stewart* v. *St. L., Ft. S. & W. R. R. Co.* 41 Fed. Rep. 736, decided by Mr. Justice FOSTER of the United States Circuit Court for the District of Kansas, one Tiernan and others had purchased an old railroad bed and incorporated the defendant railroad company, and were on its first board of directors. They then sold the road-bed to the company for $200,000 of the notes of the company and $3,600,000 of its capital stock, which purchase was afterwards ratified by the stockholders. The court said: "At the time of the sale there were no stockholders, and the $3,600,000 stock issued under the said purchase was all that had been subscribed or issued, and the only assets of the company were its charter and this road-bed. It appears, from the evidence, that the road-bed originally cost about $2000. It had no marketable value, only as it could be used for the purpose for which it was made. It also appears, from the evidence, that the stock and notes of the company, at the time they were issued, had no present marketable value. The value of the property sold, as well as consideration paid, (stock and notes,) depended very largely upon the success of the enterprise. There is no doubt but the directors—Tiernan,

Ayers, and, perhaps, Bronson—while directors of the company used their influence to consummate this sale from themselves, as individuals, to the company, and it is altogether probable that they had that object in view when they bought the road-bed. But the question still remains, were they guilty of fraud, deception or any other breach of good faith in their fiduciary relations as directors? * * * It does not appear, in this case, that there was any deception or fraud practiced by the parties. The property was open to inspection, and the approximate cost of constructing it was easily obtainable. Its value to the company for the purpose desired was not difficult to ascertain. * * * Now, who was defrauded or deceived? All parties—directors and stockholders—assented to it, and surely subsequent purchasers of the stock, or the corporation itself, cannot now object to it. 1 Mor. Pri. Corp. 290."

In *St. L., Ft. S. & W. R. R. Co.* v. *Tiernan*, 37 Kan. 606, a suit was brought on one of the promissory notes given for the road-bed mentioned in *Stewart* v. *St. Louis, etc. R. R. Co. supra*, and in reviewing the same transaction the Supreme Court of Kansas said: "It has been decided, time and time again, that the owner of a mine, an oil well or a valuable patent can organize a corporate company to develop mineral or oil or to manufacture the patented article, take a very large amount of stock in payment of his mine, oil well or patent, and trust to the value given the stock by the success of the corporation for payment of his labor and discovery. In this class of cases there is a mere transfer of the status of the mine, oil well or patent. It ceases to be personal property and becomes corporate property, and each individual interest, as well as that of the owner, discoverer or patentee, is represented by shares of stock. It is now decided in this case that the owners of a graded railroad bed can sell the same to a railroad company whose officers and directors

are composed of the same identical persons who own the road-bed, and issue the capital stock of the railroad company in payment thereof, at a time when those who sell the road-bed and own and control the railroad corporation are the absolute owners of all the stock issued by the railroad company, and when the terms of sale and the issue of stock are matters of record on the books of the railroad company, and when this transaction occurs months before any other or additional stock is issued by the company; that parties owning an old railroad grade, with culverts and some bridges erected thereon, and who organized, control, manage and own a railroad company, whose stock, at the time of the issue, has no market but only a nominal value, can transfer the railroad grade to the railroad company, and issue the stock of the company in payment therefor, they, and they alone, at that time, being the only persons interested in the road-bed and in the railroad company." Substantially the same doctrine has been announced in numerous other cases, English and American. *In re Ambrose, etc. Co.* L. R. 14 Ch. Div. 390; *Lorillard* v. *Clyde,* 68 N.Y. 384; *Dupont* v. *Tilden,* 42 id. 87. See, also, *Protection Life Ins. Co.* v. *Osgood,* 93 Ill. 69; *Union Mutual Life Ins. Co.* v. *Frear Stone Manf. Co.* 97 id. 537; *Bouton* v. *Dement,* 123 id. 142 ; *Winston* v. *Dorsett Pipe and Paving Co.* 129 id. 64.

It is not, of course, decided that such a disposition of these certificates as was made to Benson, Blaney and Sherman, (and including, possibly, the trustee, Blodgett,) would have been valid as to others subscribing and paying for stock at par, without notice of and not consenting to such disposition, nor as to creditors injured by the transaction who had relied upon the company's having received face value for its corporate stock. Different principles control the decision of such cases, as they do in other branches of the law where the rights of creditors and innocent purchasers are involved, and transactions are held invalid as to them which are valid and binding

between the parties and those in privity with them. But little is said in the many long and able arguments of counsel for appellants as to this distinction. The defendants to this bill, other than the company, are in no better position to question the validity of these certificates than the company itself. They are, in the main, mere purchasers of the original mortgage indebtedness, and holders of evidences of later credits extended to the company, with full knowledge of all the facts attending the transactions which 'they now seek to impeach, and which they must, on the evidence, be held to have known the company, its stockholders and creditors had treated as valid for more than twenty years, and all of which debts of the company, so far as valid, the bill seeks to have paid. Surely no creditor can ask for more than his debt. True, it is said by appellants that Higgins is the holder of substantially all of the $25,000 of preferred stock issued by the company, for full value paid after the issuing of all of the certificates to Benson and others, in controversy. The purchasers of this preferred stock took it with full notice of the equities of the holders of the certificates of common stock and scrip, and, like the corporation itself and its creditors, have acquiesced in the validity of such scrip and stock ever since the issue of the preferred stock in 1860. The preferred stock was itself authorized and created by the holders of the common stock, the charter being silent on the subject, and the holders of such preferred stock thus created could not stand by for more than twenty years, while the holders of the common stock elected the managers and performed all other acts as stockholders of the company, and then be permitted to say that as holders of the preferred stock they are the only stockholders. They occupy no better position to question the validity of any issue of the common stock or scrip than that occupied by the holders of common stock, or by the corporation itself, or by any subsequent creditor with knowledge of or consenting

to such issue. Indeed, the validity of this preferred stock is also challenged, and the learned chancellor of the circuit court held that it was issued without power therefor; that if valid at all it is only as common stock, and that the defendants to the bill holding such stock should account for all dividends received on it, none having been paid on other stock. This question will, however, be considered at another place.

It is further insisted by appellants, that even if the law be as contended for by appellees, still the evidence shows the stock and scrip were not issued to Benson in payment for his equity in the land. It is said that both Beveridge and Moss, the assignees, testified that there' was no other consideration for the conveyance of the land to the company than the assumption by the company of the mortgage debts resting upon it. They did so testify in substance; that they knew of no other consideration; that they, as assignees, received nothing from the company; but they stated also that Benson attended to the matter of disposing of the assigned property by authority of his creditors, subject only to their approval, and it is evident that they meant only to testify that, as assignees, they received no stock or scrip, or promise of any, from the company for the conveyance of the lands, but, as said by Moss, the stock and scrip belonged to Benson, outside of the estate. As Benson's creditors had given full authority in the premises, the reason it did not pass through the hands of the assignees is apparent. The deeds also acknowledged a money consideration, and full receipt thereof, of upwards of $11,000, which the evidence fails to show was ever paid. Other witnesses testified that it was talked over in the board of managers, and it was considered that the stock and scrip belonged to Benson for his equity in the land. It was ordered issued to him accordingly, subject to the pledge of $93,700 of the stock to Blodgett. This pledge was perfectly consistent with the claims of Benson, as it was apparent the

success of the entire enterprise depended on the co-opera-
tion of the mortgage creditors, and Benson was more
interested in obtaining such co-operation, by securing the
payment of their debts, than any one else. The records
of the company, though imperfect, show that the board
of managers considered that Benson was entitled to the
stock. It fixed the amount at $150,000, and ordered it to
be issued to the parties entitled, in such shares as they
should direct, and after the pledge to Blodgett they
adopted the form of conditional scrip, reciting the pledge,
and ordered it to be issued to Benson, Blaney and Sher-
man, as it had been talked over in the board,—that is, to
Benson $115,000, Blaney $20,000 and to Sherman $15,000.
We have carefully considered the evidence, and are satis-
fied therefrom that the real consideration for this stock
and scrip was Benson's equity in the land. No other
reasonable conclusion can be drawn from the evidence
when it is all considered together. Whether or not it
was voidable at the election of the company, because of
over-valuation of the property, it is not now necessary
to decide. As the company, by successive boards of man-
agement, elected, in the main, by the creditors and not
by scripholders, not only acquiesced in the transaction,
but ratified it in many ways, as before shown, through a
period of more than twenty years, it is now too late for
the company to avoid it. The same reasoning also leads
to the conclusion that this stock and scrip must be treated
as having been fully paid for, and that it would be in-
equitable to require the holders of it to pay for it again,
on any basis which could be now fixed, as a condition of
equitable relief. We think the trial court erred in requir-
ing such payment, and the decree in that respect is
reversed.

*Construction of the scrip certificates.*—Counsel for appel-
lants have argued, with great vigor and ability, that the
trial court erred in holding that the certificates of condi-
tional scrip are equitable assignments of the interest of

the company in the shares of stock pledged to Blodgett, entitling the holders of such scrip to redeem such stock from the pledge, and have cited a vast array of authorities which they insist support their contention that, instead of amounting to equitable assignments, they are mere executory agreements of the company to pay the designated amount out of the stock pledged to Blodgett, at its face value, when it should again come into the possession of the company, and that the complainant's remedy, if any he has, is not in equity, but by action at law upon such executory agreements. We cannot undertake, in the time at our command to be given to this case, nor within any reasonable space, to review to any considerable extent the arguments of counsel nor the numerous cases cited bearing upon this question. We do not think, however, that the authorities sustain the views contended for. The scrip certificate recites the fact that the stock was pledged to Blodgett, and then refers to the Blodgett receipt on file with the company as stating the conditions of the pledge, and certifies that Benson is entitled to $5000, payable in said pledged stock at par, at any time after it shall again come into the possession of the company. It is said, this is a clear promise to pay out of a particular fund (of stock) *in futuro*, on the happening of a contingency, and not an executed assignment, constituting Benson the equitable owner *in præsenti* of the amount of stock called for. The argument is not without force, but is, we think, more plausible than sound. The stock certificates themselves are made transferable only on the books of the company, and provide that no assignment thereof shall take effect until the return of the certificates and the issue of new ones. The provision in question in the scrip was a mere recognition of the provision in the stock that the certificate must be returned and a new one issued before the assignee could become the legal owner of the stock. It did not affect the character of the scrip as an equitable

assignment *pro tanto* of the stock, subject to the pledge, if otherwise the instrument amounted to such assignment. The legal title to the stock could not pass to the scripholder except through the company, by a return and cancellation of the old certificate and the issue of a new one. As said by the learned chancellor who tried the case below, the company was a mere conduit through which the legal title would pass. To say that such a provision in the scrip destroyed its character as an equitable assignment is practically to say that no equitable assignment could have been made which recognized the above mentioned provision in the stock.

It is said, also, that the scrip certifies that Benson is entitled to $5000 payable in said stock at par, and that by the word "payable" is meant to be paid, and imports a promise to pay in stock, and makes the certificate an executory agreement instead of an executed assignment. This is also a plausible construction if that clause be considered alone, and without any reference to the entire transaction, of which it was only a part. The certificate certifies that Benson "is entitled to $5000," not of money, —not even of stock at its real or market value,—but payable in the pledged stock at par. We think the word "payable" should be referred to the legal satisfaction of the equitable demand,—that is to say, Benson is declared to be entitled to, or the equitable owner of, $5000 of the pledged stock, to be made the legal owner whenever the pledged stock shall have been returned to the company and new certificates issued therefor. Not only must all the provisions of the scrip certificate be considered together, but they must be considered in connection with the stock certificates and the receipt containing the conditions of the pledge, referred to in the scrip, and in the light of the circumstances under which the transaction took place. Pomeroy, in his work on Equity Jurisprudence, (vol. 3, sec. 1282,) says : "What shall amount to the present appropriation which constitutes an equitable

assignment, is a question of intention, to be gathered from all the language, construed in the light of the surrounding circumstances." See, also, *Otis* v. *Beckwith*, 49 Ill. 121 ; *Padfield* v. *Padfield*, 72 id. 322.

Thus interpreted, what was the intention of the parties? We think, without doubt, it was to declare that the holder of the scrip was entitled to the designated amount of stock, subject to the pledge to Blodgett. While the certificates of scrip may, in one sense, be held to be equitable assignments of the interest of the company in the stock in question, they may more properly be designated as written declarations of the interest which the scripholder had in the pledged stock, as certificates of stock are written declarations or acknowledgments by the corporation of the interest of the holder in the corporate property and franchises. Cook on Stock and Stockholders, sec. 10 ; *Burr* v. *Wilcox*, 22 N. Y. 551 ; see, also, *Kekewich* v. *Manning*, 1 DeG., M. & G. 176. The legal title being in Blodgett, the company could not transfer or vest it in Benson, but it could, and we think did, vest in him the equitable title,—and that, equity will protect and enforce.

The cases cited by counsel holding that a promise to pay a debt out of a particular fund will not constitute an equitable assignment of any part of the fund are inapplicable. Counsel, however, rely with great confidence on *Brown* v. *Lehigh Coal and Navigation Co.* 49 Pa. St. 272, as sustaining their views. We do not so regard it. We can not stop here to review that case, but we have carefully examined it, and find that the principal features of the certificate or contract there referred to by the court as of controlling importance, were radically different from those which must control the construction of the scrip certificates involved in this cause.

As a part of this branch of the case it is also urged that the claim against Blodgett, arising out of the contract of pledge, cannot be divided, and Blodgett com-

pelled to answer different suits involving conflicting interests; that his contract is an entirety, and cannot be divided without his consent; and *Stone* v. *Pratt*, 25 Ill. 16, and *Chicago and Northwestern Railroad Co.* v. *Nichols*, 57 id. 464, are cited to support this view. The questions there decided were wholly different from the ones here involved. Without entering into any discussion of the rule contended for, and which, it may be remarked, pertains more to suits at law than in equity, we are of the opinion that in this case the supposed division of the cause of action is more apparent than real. In the first place, the pledge debt must be fully paid and the whole of the stock returned to the company before any of it can be issued to complainant. When the debt for which Blodgett holds the stock shall have been fully paid, (as under the ruling of the trial court relating to the accounting appellants admit has already been done,) he must, under his contract of pledge, return the stock to the company to be re-issued to those entitled to it, and when he has done this his contract is complied with; or if the complainant should be required to pay off the pledge debt in order to redeem, he would, in equity, be subrogated to the rights of the pledgee, and might, by judicial decree, become the custodian of the stock in place of Blodgett, and in either case Blodgett would be released. The complainant cannot redeem a part of the stock. He must redeem all or none. Blodgett cannot be required to surrender any part until the whole debt is paid. And in the second place, we are of the opinion that the complainant, under the allegations of his bill and the proofs, has the right to represent the corporation, and sue on its behalf as well as his own. His interests are not antagonistic to the interests of the corporation, but consistent with them. He was, by force of the act of the company, made the equitable owner of a part of this pledged stock. The company never repudiated that act, but repeatedly confirmed it. He is interested in having the pledge debt

paid, and so is the company. The corporation, as such, is not now for the first time interested in repudiating its contract, made in 1859, with these scripholders, and in perpetuating and increasing the pledge debt and the mortgage debts against itself, in order that either its creditors or a minority of its shareholders may control its affairs. It is true, the corporation is made a defendant, but that is in accordance with proper practice; equity looks to the real interest of the° parties, rather than to the position they may happen to occupy on the docket. True, there was no demand by complainant upon the corporation or its board of managers, as such, to ask for an accounting or to bring suit to compel an accounting, or to redeem the stock; but, as before stated in the statement of facts, requests of substantially the same import were made to Blodgett, Higgins, and other officers and managers of the company, and were refused. Complainant was referred by the trustee and others, managers of the company, to Higgins, as the one owning and controlling substantially all financial or beneficial interests in the corporation, as well as its pledge and mortgage debts. Higgins objected to any accounting, as unnecessary; said there was no dispute between him and the company, and that complainant could file his bill if he wished and have an accounting in that way; that if he did not do so soon, and enjoin the sale of the pledged stock, he would have it sold. The trustee did advertise the stock for sale. It is clear, from the evidence, that any request ·to the board of managers, as a body, to take any action in the premises, would have been unavailing. Such demand was therefore unnecessary. *City of Chicago* v. *Cameron*, 120 Ill. 447; *Chicago Hansom Cab Co.* v. *Yerkes*, 141 id. 320; *Wheeler et al.* v. *Pullman Iron and Steel Co.* 143 id. 197.

We fully concur in what was said by the learned chancellor, on the trial below, as to the right of the complainant to maintain the suit. He said: "I have had some difficulty as to the technical objection that no application was ever made to the corporation, or to the man-

agers, as a board, to bring this suit. While it is true that suits to obtain relief against the wrongful dealings of directors and officers with the corporation property must be brought in the name of the corporation, yet there is the exception that a stockholder may bring it on behalf of himself and other stockholders, when the board of directors or managers actually or virtually refuse to bring such suit. It is not indispensable, however, that a demand on the board should first be made. If the facts alleged show that the defendants charged with the wrongdoing are so under the control of the wrongdoing defendants that a refusal of the board, if requested to act, may be inferred with reasonable certainty, then an action may be sustained by a stockholder without alleging or proving a demand upon the board of managers to bring the suit. Equity never requires a useless act. I am satisfied, from the evidence, that the board would have refused to bring the suit if a demand had been made. It was therefore unnecessary. These complainants do not occupy the positions of stockholders, only, but have a standing, as owners of the equity of redemption in the stock pledged to Blodgett, to come into equity for an accounting and to redeem the stock. It is not necessary for them, in that regard, to demand that the corporation should bring the suit. I am of the opinion, also, that under the peculiar language of this charter the complainants, by virtue of the issue to them of the scrip, have such an equitable interest in the property of the corporation as will give them a standing in a court of equity to investigate transactions of the kind herein considered, if the corporation refuses to do so." The suit being one to redeem all the stock, and not a part, only, the objection raised by counsel that the obligation of Blodgett created by the pledge can not be divided, is without force.

*No adequate remedy at law.*—Equally untenable is the position assumed by appellants that appellees have an adequate remedy at law. The complainant in the bill

seeks to make his equitable interests available, and to have them converted into legal ownership; to redeem the pledged stock; to compel an accounting between the corporation and the holders of the debt for which the stock is pledged, in order to ascertain what, if anything, is due on this debt, and to set aside certain alleged illegal contracts between the corporation and Higgins. These are some of the purposes of the suit, and in aid of which the trial court granted relief. In a suit for damages, what would be the measure of damages and how could the amount be ascertained? No argument is needed to show that no adequate relief could be had at law.

*Amount of complainant's scrip.*—It is a question of some difficulty, raised in the case, to determine whether the complainant, Lansingh, as administrator of the estate of John Dempster, deceased, is entitled to the three certificates in his possession,—two for $5000 each, and one for $9000,—or to the one for $9000 only. The trial court found that he was entitled to the three, aggregating $19,000; that the two certificates only, of $5000 each, had been paid for to the company, and required him, as a condition of relief upon the other, to pay the face amount of it for the benefit of the company. It is strenuously insisted by appellants that the complainant is entitled only to the $9000 certificate,—that it was issued in the place of and to take up the other two, but that by accident, mistake or inattention the two $5000 certificates were not surrendered to the company. Dempster was a creditor of Benson when the latter failed, but the amount of the debt is not shown. After his death, in 1863, the three certificates were found among his papers, but as the company was then thought to be insolvent they were not regarded as of any value. The order of the board of managers for the issuing of the scrip to Benson, Blaney and Sherman, in the proportions before stated, was made November 2, 1859. The two certificates, of $5000 each, of conditional scrip, found in Dempster's possession,

were numbered 1 and 2, respectively, and dated November 5, 1859. They were issued to Benson, and contained his endorsement in blank. The other certificate of $9000, No. 93, was issued July 25, 1860, direct to Dempster, but was endorsed, "Pay Rev. John Dempster.—F. H. Benson." It appears from the evidence that Dempster never had any dealings directly with the company, never paid the company anything, and it never owed him anything. But before the issuing of any scrip, and on October 8, 1859, the board passed the following resolution :

"*Resolved*, That the executive officer of the company be authorized to instruct and direct H. W. Blodgett to assign or transfer to John Dempster $10,000 of the stock of the Rosehill Cemetery Company, to be delivered to him, said Dempster, whenever the conditions on which he, the said Blodgett, holds the same are complied with on the part of said company: *Provided*, that the assignees of F. H. Benson will receive the same as in liquidation of their claims on the Rosehill Cemetery Company, for the purchase of their interest in the town of Chittenden, to the amount of $10,000.

"On motion, James V. Z. Blaney was appointed to procure a form for scrip for stock certificates."

A copy of this resolution, omitting the proviso, was served on Blodgett soon after, which, with Blodgett's acknowledgment of service, was afterwards found in possession of Benson. There was also found among Dempster's papers a certificate of common stock of the company (not involved in this suit except as evidence affecting his right to the scrip) of $4500, No. 92, and dated also July 25, 1859, issued directly to Dempster; also, a receipt from the treasurer of the company of same date, for $1500 of scrip in full of ten per cent on $15,000 of the stock of the company. The transaction and execution of the scrip, stock and receipt of date July 25 are accounted for in this way: The managers, being advised they could not make an assessment on the stock, resolved to ask the holders

of both stock and scrip, other than Blodgett, to make a voluntary contribution, in stock or scrip, of ten per cent, to use in relieving the company from its financial embarrassment. Many complied, some did not. Benson paid $4000 in this way on $40,000, held by him. No distinction was made between stock and scrip. The treasurer, J. Woodbridge Smith, testified that to the best of his recollection he gave the stock and scrip to the president, Olmstead, to deliver to Dempster, but knows nothing of what was done with it. Appellants contend that Olmstead must have delivered the two certificates of stock and scrip, and the receipt dated July 25, to Dempster, and failed to take up the old certificates, while appellees insist that appellants' contention is not founded on evidence, but upon a mere guess. Benson testified that he delivered Dempster $5000 of stock and $10,000 of scrip, and did not think he gave him any more. He produced his memorandum book, which contained a memorandum of such delivery in connection with similar dispositions of stock and scrip to others, but it contained no dates or numbers of the certificates. It also contained, in pencil, memoranda of other considerable amounts of stock and scrip, without connection with any names, or other explanation. The value of Benson's testimony, even when refreshed by this book, is somewhat impaired by his evident lack of recollection of the circumstances attending the transaction between himself and Dempster, and his dependence on these memoranda, which themselves needed more explanation than he was able to give. Sherman testified that Benson turned over to Dempster "quite a quantity" of this scrip and some real estate, but he did not know how much. No one else was called who knew anything about the transaction.

It is said, however, that the books of the company fail to show that Dempster ever returned to the company any original certificates of stock or scrip for which the new certificates of July 25 must have been issued. The

chancellor found, on the evidence adduced before him, without any reference of the question to the master, that $10,000 of the scrip was paid for by Dempster to the company under the resolution of October 8, above set out, and the release by the assignees of that amount mentioned as consideration in their deeds to the company; that in addition Dempster had $10,000 of scrip and $5000 of stock from Benson, and that after receiving from the company the certificates of $4500 of stock and $9000 of scrip, and the receipt of $1500 dated July 25, he had, and was entitled to hold, the other two scrip certificates, of $5000 each. The assignees, however, testified that there never was any such release in fact, nor any such consideration, notwithstanding it is stated in the deed as having been received. Appellants contend, that if Dempster had ever returned the original certificates for which those of July 25 must have been issued, there would have been some book account of it. This, we think, does not necessarily follow. The books were shown to be otherwise somewhat imperfect. The certificates may have been returned and destroyed in the great fire, or otherwise, as other papers and books of the company were shown to have been. The mere fact that twenty-five years after the transaction neither the original certificates for which the one for $9000 is supposed to have been given, nor any book account of the company showing their return, can be found, is not sufficient to overcome the presumption of *bona fide* ownership of the two $5000 certificates, raised by their possession and production on the trial. The fact that they were not canceled on the books of the company would seem to be some evidence that they were not improperly retained after being replaced by others. This scrip and stock were not of great value at that time, and Dempster may have demanded and received a large amount for a much smaller debt. Besides, Benson disposed of a large amount of the scrip among his other creditors, and Dempster may have received it from them.

Benson testified that he was not present when the certificates of July 25 were issued. They do not show, nor do the books of the company, what certificates they were intended to replace. All is left to inference and conjecture. It does not appear that the original stock certificate of $5000 transferred by Benson to Dempster, for which the one for $4500 was given, was found among Dempster's papers. It is not claimed there is any duplication of stock certificates; and if not of them, then why of the others? The replacing of the original stock and scrip certificates by new ones of July 25 was all one transaction, and it would not seem any more probable that Dempster would, by negligence or other cause, retain one rather than the other. The receipt of the treasurer of the company, showing the company had received the assessment or contribution of $1500 of scrip on $15,000 of stock, was also found in Dempster's possession. This receipt is, of course, *prima facie* evidence that the company had received it. But if Dempster retained the two scrip certificates uncanceled after receiving the new one intended to replace them, not only did the company not receive the $1500 of scrip, as stated in the receipt, but it had made him a gift of the new certificate. This would hardly seem probable, when it is considered that the company was then trying to collect in these voluntary assessments to use in paying its debts and expenses. It would imply the grossest negligence on the part of the officers of the company, as well as on the part of Dempster. Dempster may have been willing to pay an assessment on part, but not on all, of his scrip, or he may not have then owned it all. There is no evidence to show when or from whom he obtained the two certificates numbered 1 and 2. True, Benson's name is written across their backs; but they may have passed through other hands, or, as found by the trial court, he may have received $10,000 of scrip under the resolution of October 8, and may have been willing to pay the assessment on it,

and not on the certificates he received from Benson or acquired otherwise, or upon the latter and not the former.

The evidence is inconclusive and unsatisfactory, but the three certificates having been issued by the company in pursuance of orders of the board of managers, and being in the possession of and produced by the complainant, and the trial court having heard the evidence and found that the complainant is entitled to them, we are of the opinion the decree should not in that respect be disturbed, and it is therefore in that respect affirmed.

*The J. W. Smith account—Are the creditors mortgagees in possession?*—Among other transactions of the company as to which an accounting is sought by the bill of complaint, are the account of J. W. Smith, and the final settlement made with him by the company, May 11, 1859. Smith, through his firm of Lombard & Smith, proposed to make a loan to the company of $6000, on condition, among other things, that he be appointed treasurer, at a salary of $500 per annum, until his advances and the interest upon his loan were paid. The proposition was accepted, and Smith was, upon the same day, elected treasurer of the company. November 8, 1862, Smith and Blodgett were elected managers by a vote of the stockholders, Blodgett and Benson voting the 937 shares in Blodgett's hands, together. Smith continued to act as treasurer until August 10, 1874, when he resigned. He continued to act as manager until July 9, 1878, when he resigned. As treasurer he had charge of all the books, vouchers and records of the company. He is charged by appellees with having largely overcharged the company, by way of compound interest and otherwise. During this period Smith rendered statements, from time to time, of his account to the board, and had a final settlement in 1873. This settlement was had as the result of the appointment of a committee, and an examination of his accounts by an expert employed for that purpose, whose report was spread upon the records of the board. Upon this final settlement he

received the note of the company for $7523.10, representing the balance then found due him.   He also held a separate note of the company for $6000, claimed to represent a loan, both of which he afterwards sold to Higgins.   In 1864, while Smith was connected with the company, he purchased Blodgett's interest in the Newhouse debt, and some other demands for money loaned, for about one-fourth their face value, and appellees claim that he always identified himself with the creditors of the company, and gradually acquired almost complete control of the management of the company.   Appellees' contentions respecting this account, and that the creditors who had obtained control of the company should be treated and compelled to account as mortgagees in possession, are stated by their counsel in part as follows :

"Sales of lots proved insufficient to furnish the money required for improvements and cemetery purposes, and notwithstanding the loan from Smith, the company became pressed for funds, and for years had hard struggles to maintain itself.   By degrees the bond creditors began to actively assert their powers under the pledges and mortgages held by them, and to place themselves in control of the company.   They gradually elected their own men into the management and eliminated the debtor element, until there was no one to represent the latter. Smith, who had been a lawyer, and was apparently an intelligent man, seems to have obtained the confidence of the creditors, and little by little was given the entire control of everything, (even before his purchase of an interest in the bonds,) consulting and obtaining his orders from Blodgett and Newhouse alone, and going so far as to deny Benson, who was then one of the board of managers and the superintendent, access to the books in a very harsh manner, and ultimately both Benson and Sherman were, as they express it, 'crowded out,' Sherman leaving first and Benson afterwards.   Benson had been practically thrown to one side as early as 1863, '64 or

'65, and finally left in 1866. This left the creditors in sole possession, for Blaney had gone into the army, and after his return was incapacitated.    *    *    *

"A systematic course of depreciation of the company was inaugurated. Access to the books and information of the company's affairs were denied the outside certificate-holders.    *    *    *    Smith began a peculiar system of book-keeping, financiering and management. His account, when analyzed, shows that his total claims for money advanced (including the $6000 and salary during thirteen years, from 1860 to 1873,) amount to $28,145.07, but during that period he managed to charge up to his own credit $80,469.98, all of which he practically drew from the company,—$54,680.88 in cash; $3366 in bills receivable, secured by real estate; $13,523.10 in bills payable, which he afterward turned over to Higgins; and $8900 in the preferred stock of the company, now held by Higgins. This seems to have been accomplished, partly by skillful adjustments of interest, compounding at the rate of ten per cent per annum, in many instances every six months, and sometimes oftener; partly by purchasing several floating unsecured claims against the company for nominal sums, (if they are not to be considered as thrown in for nothing, in connection with other purchases,) and then charging them up against the company to his own credit at large advances over their face amount,—larger, even, than interest at ten per cent, compounded quarterly, would make them; and partly by his method of absorbing the so-called preferred stock on these accounts, (at least $8900 of the $23,800 now claimed by Higgins was taken by Smith in this manner without subscription, or even having the grace to get an order of the board for its issuance,) and afterward crediting himself with dividends upon the same, and interest on the dividends compounded at the rate of ten per cent per annum every six months.

"The steady course of depreciation and the spirit of depression began to tell upon the creditors themselves. Blodgett and the other creditors became affected by it, but they neither foreclosed nor yet resigned back their control into the hands of Benson and the stockholders, which would have given the latter opportunity to investigate, correct the company's accounts, and make an effort to bring the company to success. Instead of this, the creditors chose to continue their control, uphold Smith, and effectually prevent the certificateholders from knowing or doing anything in connection with the company's affairs, and at the same time carelessly allowed Smith to manipulate his accounts as he pleased, and entirely neglected their responsibilities of management which they had chosen to exact and assume. From April, 1864, to August, 1867, they held no meeting of the board of managers, and from April, 1864, to June, 1871,—over seven years,—only one meeting. Not only had the creditors exacted the pledge and then taken the responsibility of reducing the property and company to their absolute possession and control, but the scripholders, by the pledge to Blodgett, had been deprived of the right of notice of meetings, and never had any such notice; were prohibited by one of the by-laws from access to the books of the company, and on making inquiries could obtain no information. Various scripholders, from 1864 on, attempted, from time to time, to learn something of the condition of the company, but were effectually put off by Smith, who told them the company was bankrupt and an investigation of its affairs would be useless ; that the debt was more than the property was worth, and therefore the stock worthless."

The provision in the by-law mentioned is a part of the by-law prescribing the duties of the secretary in keeping the books and papers of the company, and is as follows : "Which books and files shall be at all times open to the inspection of the president and such officers and

committees of the board of managers as the board may authorize, and to no others." This provision, however, seems to have been a part of the by-laws from the first organization of the company.

Appellees now insist on an accounting as to these transactions of Smith; also, that the creditors and their trustee should account, from the beginning of their control, as mortgagees in possession. This relief was denied, and we think properly, by the trial court. Smith is not a party to the suit, and no decree could be rendered against him. But appellees insist that Higgins is now the holder of the corporate notes and preferred stock obtained by Smith, and took them with notice, actual or constructive, of their infirmities, and that these notes may be reached and affected by the decree without making Smith a party; also, that as Smith was acting under and for the creditors, they are liable, as mortgagees in possession, to account for his alleged mismanagement.

The first point insisted on is sufficiently answered by the fact that Smith, the payee of the notes assigned to Higgins, and who is alleged to have committed the frauds affecting their consideration, is not made a party to the suit. (*Elston* v. *Blanchard*, 2 Scam. 420; *Packwood* v. *Gridley*, 39 Ill. 388.) We concur in the opinion of the trial court that the settlement with Smith cannot now, in this case, be impeached.

As to the second point, that the creditors made defendants to the bill should account, as mortgagees in possession, for these transactions of Smith, and for other dealings of their own, with the corporation and its property, we also concur in the holding of the trial court adversely to appellees. On this subject the learned chancellor said: "Now, there is no authority presented to me which holds, or tends to hold, that a party who holds stock, as collateral or otherwise,—a majority of the stock,—by voting that stock and putting his own men in office becomes really in possession of the corporation.

I cannot see how the theory of the bill can be maintained. You might just as well say that if I own a majority of stock and bring my men into office I become responsible for all the acts of those officers, as to say that I, holding it as collateral security and voting it, become a mortgagee in possession. I can see no distinction between the two, and it is not true that the officers who are voted in become, in one sense, in law or equity, the agents of the parties who vote them into office. They are agents of the corporation, and not of the men who vote the majority of the stock. * * * It would be a hard doctrine to hold, where officers, who are bound to serve the interests of all the stockholders,—bound to serve the interests of the corporation,—were voted in by a certain party who has no control over them after they are voted in, that such party should be liable for all the acts of omission and of negligence and of fraud that they may do while in office."

Appellees say: "The only substantial difference between an ordinary mortgagee in possession and the present case is, that the former has possession and control of the property, while in the present case the creditors, with the aid of machinery devised by themselves expressly for that purpose, have possession and control, not only of the property, but even of the very name and voice and entity of their debtor." It cannot be pretended that these creditors, as such, went into possession of the corporate property under the mortgages and deeds of trust, and dealt with it as individuals, or otherwise, under such mortgages, but, at most, that by voting, through Blodgett, the 937 shares pledged to him as trustee they elected such managers as suited them, as fast as vacancies occurred, and thus gradually acquired the controlling power through these managers, and that the managers neglected their duties and permitted, at first J. Woodbridge Smith and later Van H. Higgins, to obtain practically the absolute control and management of the corporation and its

property, which they, Smith and Higgins, made use of to their own profit and to the injury of the company and its shareholders. It must have been the intention of all concerned, in authorizing Blodgett to vote the pledged stock, to give the creditors the controlling power as stockholders. But that power was exhausted when exercised in voting the pledged stock, and the actual control of the corporation and its property was conferred on the managers in precisely the same manner (as pointed out by the learned chancellor in the circuit court) as in other cases where those holding a majority of the stock, whether as owners or as agents of the owners, elect the trustees, directors or managers. It cannot, of course, be claimed that complainant has any remedy against the creditors, merely, as stockholders, for mismanagement of the managers. In *Faulds* v. *Yates*, 57 Ill. 416, where three stockholders had combined to control the corporation, this court said: "Three persons, owning a majority of the stock, had the unquestioned right to combine, and thus secure the board of directors and the management of the property. Corporations are governed by the republican principle, that the whole are bound by the acts of the majority, when the acts conform to the law of their creation. The co-operation, then, of these parties, in the election of the officers of the company, and their agreement not to buy or sell stock except for their joint benefit, cannot properly be characterized as dishonest, and violative of the rights of others and in contravention of public policy." Nor do we think it can be held that the creditors have control "with the aid of machinery devised by themselves expressly for that purpose." Whatever control they have or had was acquired by their holding and voting a majority of the stock, and this by voluntary contract with the company, when controlled by Benson and others interested with him, and before appellees acquired their scrip or stock. We do not overlook the fact that the bonds of the company given to these creditors in 1859, in

pursuance of its assumption of Benson's mortgage debt on the land, provided that "for the faithful and prompt payment of said principal sum, and interest thereon as the same becomes due, said company hereby pledges its income, property and franchises." But it was shown by the evidence that it was doubted whether the company had the lawful power to 'make such a pledge, and the pledge of the stock was adopted to obviate this legal difficulty, and it does not appear that any attempt was ever made to enforce the pledge provision in the bonds.

'In *Pullman Palace Car Co.* v. *Missouri Pacific Railway Co.* 115 U. S. 597, where the question arose whether one railroad company had the control and management of another from the fact that it owned a majority of the stock of such other company and elected its directors, Mr. Chief Justice Waite, in delivering the opinion of the court, said : "In a sense, the stockholders of a corporation own its property, but they are not the managers of its business or in the immediate control of its affairs. Ordinarily they elect the governing body of the corporation, and that body controls its property. Such is the case here. The Missouri Pacific company owns enough of the stock of the St. Louis, Iron Mountain and Southern to control the election of directors, and this it has done. The directors now control the road through their own agents and executive officers, and these agents and officers are in no way under the direction of the Missouri Pacific company. If they or the directors act contrary to the wishes of the Missouri Pacific company, that company has no power to prevent it, except by the election, at the proper time and in the proper way, of other directors, or by some judicial proceeding for the protection of its interest as a stockholder. Its rights and its powers are those of a stockholder, only. It is not the corporation, in the sense of that term as applied to the management of the corporate business or the control of the corporate property."

Appellees, as scripholders, had no higher rights than stockholders had, and any stockholder could, by proper judicial proceedings, have called the managers to account for any mismanagement, not as mortgagees in possession, but as agents of the corporation of which he was a member.   If they did not choose to do this, they could not, under the plainest principles of equity, stand by for nearly twenty years, while this alleged mismanagement was going on, and then elect to hold those who had elected the managing board responsible as mortgagees in possession, and compel them to account from the beginning.

*The settlement of 1872.*—Appellees contend that this settlement is not binding on the company or on them, and should be set aside.   The substance of this settlement, so far as not already stated, is stated in the opinion of Judge Tuley, as follows :

"On the 17th day of July, 1872, a meeting of the board of managers was held, at which J. Woodbridge Smith, Blodgett, Newhouse, Blaney, Turner and Tuttle, six of the seven members of the board, were present, the other absent one being F. H. Benson.   The board declared Benson's position as manager vacant, and requested the stockholders, at their next meeting, to elect a new manager in his place.   Thereupon the board proceeded to make a new arrangement with its mortgage creditors.   By the settlement the holders of the Benson indebtedness authorized the release of the mortgage given by Benson to Newhouse, gave up and canceled (or released) the bonds of the Rosehill Cemetery Company issued to Blodgett, Newhouse, W. S. Johnson and S. F. Johnson under the resolution of May 17, 1859, as collateral security to the Benson indebtedness, sometimes called the Newhouse debt.   The holders of the Benson notes given to the Illinois and Wisconsin Land Company, secured by mortgage on some thirty acres of the land of the company, released that mortgage, and also the debt secured thereby.   The lands thus released from the two mortgages were con-

veyed by the corporation to James N. Banks upon certain trusts, among others, to pay to the holders of the original Benson debt, secured by the released mortgage to Newhouse, four-tenths of all sales of burial lots included in the Banks trust deed, and to the holders of the debt secured by the released mortgage to the Illinois and Wisconsin Land Company, one-tenth of such sales, the remaining half of the proceeds of such sales to be paid to the cemetery company. A similar application was also agreed to be made of the proceeds of the sale of the remainder of the forty acres conveyed to Blodgett in 1859 to secure the payment of bonds then issued. The board at the same meeting authorized the adjustment of the amount owing on the Newhouse mortgage indebtedness to be made by calculating compound interest, at ten per cent from 1859 to the day of adjustment, and ordered that bonds be issued for the amount so found due to the holders of the respective one-quarter interests of such indebtedness. The bonds were to be payable in ten years, with ten per cent annual interest, and to stand in place of the bonds issued in 1859 to Newhouse, Blodgett, F. S. Johnson and W. S. Johnson. The new bonds were agreed to be taken as conclusive evidence of the amount due. The effect of compounding the interest at ten per cent per annum was to bring the original debt of April 23, 1857, of $33,633.65, up to $119,023.37, after deducting some $8000 paid to Banks, who held one-fourth of the debt. The indebtedness secured by the Newhouse mortgage, and thus adjusted with compound interest, was owned at the time, one-fourth by J. Woodbridge Smith; W. H. Turner one-fourth, which he had contracted to sell to Van H. Higgins; Dr. Banks one-fourth, and Van H. Higgins one-fourth. Banks and Higgins were both present at the meeting of the board of managers at which the arrangement was made."

It may be added that it is shown by the evidence that negotiations among Smith, Higgins and others had been

going on for a year or more to bring about this settlement, but no meeting of the stockholders was called or notice of such proposed settlement given to them. The most active promoter of the settlement appears to have been J. Woodbridge Smith, who had been for many years practically in control of the company, and held the positions of manager and treasurer, and was the owner of one-fourth of the Newhouse debt besides other claims against the company. It appears he induced Higgins to buy out Dr. Foster, who owned one-fourth of the debt, in order that the settlement might be made, and we think the evidence justifies the conclusion that the settlement had been practically arranged in advance between Smith and Higgins, with the consent of other creditors and managers, and that the special meeting of July 17 was called to put into form, as a corporate act, what had already been agreed upon among those interested as creditors of the company. The amount of interest was ascertained by computing interest, not only on the annual installments of interest from the time they became due on the principal up to the time of the settlement, but, as testified to by Smith, by computing interest on interest, not at ten per cent, as provided in the resolution, but at six per cent, with annual rests, thus making a separate principal of the interest each year, upon which interest was again computed. Two of the managers voting for this settlement and re-adjustment were personally interested adversely to the company, and another, Blodgett, was their trustee, holding as collateral the 937 shares of stock of the company in trust, for them and the other creditors, as security for this same debt, and was their trustee in the deed of trust given by the company to further secure the same debt, on the lots released from the Benson mortgage. He had become connected with the company for the purpose of protecting the interests of the holders of the Newhouse debt, and at the time of this settlement he regarded the conditional scrip as invalid, and the holders

of it as having no interest in the company, its stock or property. He was identified with the creditors, who seemed to regard themselves as the owners of all beneficial interests in the corporation. True, he had no personal interest in the debt, having sold his quarter interest to J. Woodbridge Smith, and while no improper motive is, or from the evidence can be, imputed to him, it is clear that any one occupying such a position would feel constrained to support the interests of the creditors, and especially as against the scripholders whose rights he was then denying.

It is insisted by appellants that Turner had sold his interest in the debt before he was called upon to vote as a manager upon this settlement, and was not, therefore, interested adversely to the company. It appears a sale or contract of sale had been made between him and Higgins before the meeting, and that the purchase price was paid by Higgins to Turner after the meeting. Higgins was present, interested as a creditor in the settlement, and it would do violence to the evidence to hold that Turner was any the less likely to favor the creditors in preference to the corporation than if no contract respecting his interest had been made with Higgins. Of the other three managers participating in this settlement, Newhouse had been one of the holders of the debt, and by reason of that fact had been elected to the board, but had previously disposed of his interest. He resigned his position at the meeting following this settlement, and Blodgett attended but one meeting of the board in the period of ten years then next following.

It is also insisted by appellees that the evidence shows that Tuttle was elected by the creditors, and always acted in their interest, and that Blaney had become so enfeebled as to be unable to properly perform his duties as manager; and they insist the board was dominated and controlled by the creditors, and that the corporation and the interests of the stockholders were wholly unrepresented,

except in name. However that may be, we think it clear that the three managers, J. Woodbridge Smith, Turner and Blodgett, were, by reason of their being interested adversely to the company, incapable in law of acting and voting, as managers of the company, in making this settlement. They were acting as the agents of the corporation in making a contract with themselves and others interested as creditors, or with the creditors, of the company, when their interests were in conflict with the interest of the company, and while the peculiar circumstances attending this transaction may have been such that they could fairly do what appeared to be for the best interests of both the corporation and the creditors, still the law will not permit the agent to so deal with himself in transacting the business of his principal as to bind the latter so that he cannot avoid the transaction. (1 Morawetz on Private Corp. secs. 517, 525.) It will be noticed that without the vote of one or more of the three managers in question the resolution could not have been adopted. Under the by-laws it took four managers to constitute a quorum for the transaction of business of such a character,—the same number required in the absence of any by-law on the subject, the board consisting of seven members. Whether the three members who were disqualified should be treated as present or absent is immaterial, for if treated as present, and with the others forming a quorum, there was not a majority of this quorum voting for the resolution when their votes are excluded; and if treated as absent, then no quorum of the board was present.

In *Goodwin* v. *Cin. and W. C. Co.* 18 Ohio St. 169, where there had been a sale of certain canal property to a railroad company for an inadequate consideration, the directors in both companies being the same, the court said: "There was not only such a gross inadequacy of price as to shock the moral sense, but there was, in effect, a sale by a trustee to himself, or to his own use and benefit. This, equity will never permit,—not even where

there is good faith and an adequate consideration. Here there was neither. The vendor and purchaser were in the same interest. As directors of the canal company it was the duty of Mr. Lord and his associates to obtain the highest price for the property, while as stockholders of the railroad company it was their interest to get it as low as possible. It was, in effect, a sale by the railroad company to itself. There was no adverse interest or adversary parties, and the sale was a mere form. Nothing is better settled in equity than that such a transaction on the part of a trustee does not bind the *cestuis que trust.* It is equally well settled that the property of a corporation is a trust fund in the hands of its directors, for the benefit of its creditors and stockholders. (2 Story's Eq. 1252; *Aberdeen Railroad Co.* v. *Blaikie,* 1 Macq. 461; *Wood* v. *Dummer,* 3 Mason, 309.) If it was desired or intended to make such a purchase of the property as would bind the stockholders and creditors of the canal company, all of them should have either been consulted or bought out."

Morawetz, in his treatise on Private Corporations, (vol. 1, sec. 517,) says: "The directors or trustees of a corporation, in accepting their appointment to office, impliedly undertake to give the company the benefit of their best care and judgment, and to use the powers thus conferred upon them solely in the interest of the corporation. They have no right, under any circumstances, to use their official positions for their own benefit or the benefit of any one except the corporation itself. It is for this reason that the directors have no authority to represent the corporation in any transaction in which they are personally interested, in obtaining an advantage at the expense of the company. * * * Accordingly it has been held in numerous cases that the directors of a corporation have no authority to bind the company to any contract made with themselves personally, or to represent it in any transaction with third persons in which they have a private interest at stake." He further says: "The right of

the principal to refuse to be bound by a transaction in which the agent assuming to represent him has an adverse interest is unconditional. It is immaterial whether the transaction was fair or not.   *   *   *   In many cases it would be impossible to ascertain whether the agent did or did not obtain the best terms for the principal which it was possible to obtain." (1 Morawetz, sec. 522; 1 Beach on Private Corp. sec. 243.) It was also so held by this court in *Gilman, etc. Railroad Co.* v. *Kelly*, 77 Ill. 426. See, also, *Pearson* v. *Concord Railroad Co.* 13 Am. & Eng. Ry. Cases, 102, (N. H.) and cases there cited; *Wardell* v. *Union Pacific Railroad Co.* 4 Dill. 330, and 103 U. S. 648. A director cannot vote on a renewal of a note to himself. 1 Cook on Stock and Stockholders, sec. 661; *Smith* v. *Los Angeles, etc. Ass.* 20 Pac. R. 667 (Cal.)

In *Pearson* v. *Concord Railroad Co. supra,* where two railroad companies obtained control and placed their own directors in the management of a third company, and then obtained favorable contracts from such third company by vote of its board of directors so constituted, on a bill filed by a stockholder relief was granted. The court said: "The reasons for the exclusion of all inquiry into the *bona fides* of the transaction are expressed in these cases with clearness and exactness, and sometimes by the learned judges in a style both quaint and pithy. Mr. Justice FIELD said: 'The two positions impose different obligations, and their union would at once raise a conflict between interest and duty, and, constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' (*Wardell* v. *Railroad Co.* 1 Am. & Eng. Ry. Cases, 427; *Marsh* v. *Whitemore*, 21 Wall. 178, 183.) 'It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form.' (*Jewett* v. *Miller*, 10 N. Y. 402, 405.) 'The rule is founded in the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties as

trustee, in his fiduciary character.' (*Duncomb* v. *Railroad Co.* 4 Am. & Eng. Ry. Cases, 293.) 'It is founded in the danger of imposition and the presumption of the existence of fraud, which is inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation.' (*Van Epps* v. *Van Epps*, 9 Paige, 237, 242; 4 Kent's Com. 438.) Lord ELDON gave as a reason 'that the inquiry is so easily baffled in a court of justice.' (*Hatch* v. *Hatch*, 9 Ves. 297.) Lord HARDWICKE said: 'It is not enough for the trustee· to say, 'you cannot prove any fraud,' as it is in his power to conceal it.' (*Whelpdale* v. *Cookson*, 1 Ves. Sr. 8.) Lord JEFFREY said: 'It is *presumptio juris et de jure* that where a person stands in these inconsistent relations of both buyer and seller there are dangers, and it is not relevant to say that it is impossible there could be any in the particular case.' (*Hughes* v. *Watson*, Scotland, 1846.) Lord CRANWORTH said: 'It may sometimes happen that the terms on which a trustee has dealt, or attempted to deal, with the estate or interests of those for whom he is trustee, may have been as good as could have been obtained from any other person —they may even at the time have been better ; but still so inflexible is the rule that no inquiry on the subject is permitted. The English authorities on this subject are numerous and uniform. (*Aberdeen Railway Co.* v. *Blaikie*, 1 Macq. 461, H. L. 1854.) Nothing less than incapacity is able to shut the door against temptation, where the danger is imminent and the security against discovery great. The wise policy of the law has therefore put the sting of disability into the temptation, as a defensive weapon against the strength of the danger which lies in the situation.' (*York Buildings Co.* v. *Mackenzie*, 8 Bro. P. C. 42; *Davoue* v. *Fanning*, 2 Johns. Ch. 252, 270.) * * * The justness of the contracts made with themselves, and of the votes they passed as directors of the Concord railroad for their own benefit, does not impart any validity or legality to those contracts or votes. If such contracts

were to stand until shown to be fraudulent and corrupt, the result, as a general rule, would be that they must be enforced in spite of fraud or corruption. (*Flint, etc. Railroad Co.* v. *Dewey,* 14 Mich. 477.) * * * Our conclusion upon this part of the case is, that the directors of the Concord road could not make the contracts with the upper roads, nor settle the claims of those roads against the Concord road. For the transaction of that part of the business of their office they were disabled by the understanding on which, the purpose for which and the interest in and by which they were elected."

It was said by the learned chancellor in the court below, that this settlement may have been, and that he believed it was, for the best interests of the corporation at the time. This consideration, however, cannot render the contract binding against the corporation or its stockholders, against their consent. Nor are the principles here stated in conflict with the previous decisions of this court. In *Beach* v. *Miller*, 130 Ill. 162, this court said that the language of the court in *Merrick* v. *Peru Coal Co.* 61 Ill. 472, and *Harts et al.* v. *Brown et al.* 77 id. 226, to the effect that a director may purchase the property of the corporation, trade with it, borrow from or loan money to the company of which he is a member, on the same terms and in like manner as other persons, was not authorized by the records in those cases. When construed with reference to the questions before the court there is no conflict between those and later cases decided by this court. In *Beach et al.* v. *Miller, supra, Roseboom et al.* v. *Whittaker et al.* 132 Ill. 81, and in *Mullanphy Savings Bank* v. *Schott*, 135 id. 655, it was said by this court that so long as a corporation remains solvent, its directors may, with knowledge of its stockholders, deal with it, loan it money, take security or buy property of it, the same as a stranger may. It was further said, that during the solvency of the corporation the directors are the agents or trustees of the stockholders; and in *Harts* v. *Brown*,

*supra*, it was said that a director, in so dealing, must act fairly, and be free from all fraud and oppression, and must act for the interest of the company, and impose no unfair or unreasonable terms. But it has not been held that the company or its stockholders may not avoid a contract requiring the action of the board of directors to make it, whether made in good faith or not, where so many of the directors are interested in the contract adversely to the company that the company is not represented by a disinterested majority of the directors voting. On the contrary, it is held that the directors, without the sanction of the stockholders, have no power to contract, for the corporation, with themselves or for the benefit of themselves, and if they attempt to do so the contract may be avoided by the corporation or its stockholders not consenting, whether the contract appears to be fair and just or not. *Gilman, Clinton and Springfield Railroad Co.* v. *Kelly, supra; Chicago Hansom Cab Co.* v. *Yerkes, supra.*

It may be, as contended by appellants, that the settlement of 1872 was the best thing that could have been done at that time for the company, situated as it was, and doubtless the directors, had they not been interested as and for the creditors in that settlement, would have been far better qualified to judge of the interests of the company than any one else could at this late day. But the law is, nevertheless, that they were incapacitated to act by reason of their interest; and the fact remains, also, as shown by the evidence, that whatever the necessities of the company may have been, the terms of this contract were harsh and inequitable in respect to the calculation of interest. Interest was not only computed upon unpaid interest, as it became due from year to year, but a new principal, composed of interest, was created, and interest computed thereon with annual rests, and the Newhouse debt alone was made to yield upwards of $85,000 of interest, and the whole, aggregating upwards of $119,000, put

into a new principal, and bonds issued therefor at ten per cent interest. The Boston mortgage debt was not increased in the same way, by compounding the interest, but was estimated at $50,000, and was changed to a one-tenth interest in the proceeds of the sales of lots, to be paid to its holders. While J. Woodbridge Smith was left for many years practically in sole control of the affairs of the company, (at one period there being but one meeting of the managers in·seven years,) he paid to himself and others dividends on the preferred stock and left the interest on these mortgage debts unpaid. He and Higgins had bought the greater part of these debts at a small percentage of their face value, and had also become the owners of most of the preferred stock, much of it at slight cost. With reference to these debts they had no original equities to conserve. If the corporation were viewed as an individual person in the same financial straits, but capable of contracting for himself, it would in any case have seemed a hard bargain to compound this interest for so many years. But when it is seen that the corporation could act only through those interested in securing this compound interest for themselves, and that these were then shareholders financially interested, the inequity of the transaction is all the more apparent.

The trial court held that the compounding of interest and the said settlement were inequitable and usurious, and should be set aside as to the complainants' right to redeem, but that the corporation itself was bound, because the statute provides that a corporation shall not interpose the defense of usury in any action. We think the statute does not apply. One or more, at least, of the managers voting for this settlement and purporting to represent the company were admittedly interested in securing this compound interest from the company, and for that reason alone the transaction challenges strict examination and the watchful care of a court of equity, and if found to be inequitable and oppressive, for any reason,

will be set aside, on the application of the company or its stockholders, even though in the transaction some positive statutory enactment was violated which the same statute provides the corporation cannot plead in its defense. In *Jenkins* v. *Greenbaum*, 95 Ill. 11, this court said: "From an early period equity has relieved against usurious contracts by requiring payment of the principal debt and legal interest. * * * It would not, as is supposed, follow the repeal of all usury laws, that even then courts of equity would refuse to afford relief. 'No usury laws now exist in England, having been repealed by statute. It has nevertheless been decided that the repeal of these laws did not alter the doctrine by which the court of chancery affords relief against improvident and extravagant bargains.' (Bispham's Eq. sec. 222, p. 229.)" The company did not owe the amount fixed upon as due at this settlement by the method of computation resorted to, and the transaction would, in a court of equity, be regarded as oppressive and unjust, independently of any statute prohibiting usurious contracts. (See *Bowman* v. *Neely*, 137 Ill. 443, and cases there cited.) In the *Bowman-Neely case* this court held that an agreement, made in advance, to pay compound interest, except upon interest coupons, while not usurious is not enforceable in this State. It is true that it has been held that an agreement, made after installments of interest have become due, to pay interest thereon, is not invalid; but such an agreement to pay simple interest on over-due interest is quite a different thing from an agreement to compound such interest retrospectively for many years. In *Van Benschooten* v. *Lawson*, 6 Johns. Ch. 313, Mr. Chancellor KENT held that such compound interest could not be collected. He said: "If the creditor was permitted to exact from the debtor a stipulation to pay interest on arrears of interest then due, it would lead to great and inevitable abuse. It would perhaps be less mischievous, because the parties would stand upon more equal terms, to allow of such a stipula-

tion for compound interest when the original contract is about to be made. The parties are then independent of each other; but in the other case the debtor is comparatively dependent, and probably distressed, and the creditor exacts the stipulation under the evident advantage of power and superiority. The agreement on the part of the defendant to pay compound interest retrospectively does not alter the case, for the maxim *volenti non fit injuria* does not apply in these cases." This case was criticised in *Stewart* v. *Petrie*, 55 N. Y. 621, but was re-affirmed in *Young* v. *Hill*, 67 id. 162.

It is unnecessary, however, in this case to determine whether such an agreement could be enforced in this State if made between parties dealing at arms' length, but we do hold that such an agreement made between a corporation, by its board of directors, on the one hand, and one or more of such directors on the other, is unfair to the corporation and its stockholders, and would lead to great injustice and oppression, and cannot be enforced. In transacting the business of the corporation it is the duty of the directors to act for the highest interests of the corporation and its stockholders, and not for their own personal advantage, and a court of equity will set aside an unjust and oppressive contract obtained by a director in his own interest from the company, even although the company may be represented by a majority of disinterested directors. So far as the consideration of obtaining a release of more land for sale as burial lots is concerned, it would seem to have been as beneficial to the creditors as to the company. The land, having already been devoted to cemetery purposes, was more valuable for that than for any other purpose, and the debts of the creditors could doubtless be worked out and paid by sale of these lots through the company to better advantage than in any other way.

Appellants insist that if this settlement can be held invalid as a contract of directors, made with themselves

for their own benefit, the issuing, originally, of the conditional scrip must be held invalid for the same reason. But counsel overlook the fact that there was this all-important difference between the two transactions : That all the parties in interest were agreed, and there was no one, stockholder or creditor, not consenting, to be injured by the issuing of the scrip, while in the transaction of 1872 the rights of all the stockholders, including the holders of scrip, were injuriously affected, and the company, after it had passed into the hands of the managers elected by the mortgage creditors, instead of repudiating its action in issuing the scrip, not only acquiesced in it, but ratified and confirmed it in many ways. The company has been given no opportunity, since the settlement of 1872, to avoid that settlement, since it has been under the same control ever since,—and so much so, that it is found, through its officers, insisting in this case and in this court upon every advantage against itself claimed by Higgins, and one of the most effective arguments for Higgins, and against its own legal and equitable rights, was made by the distinguished counsel representing the company. This is not said in criticism of counsel, but as illustrating the fact that the company speaks only through those who, at the time, have control of it.

Nor can it be said that the holders of the stock or scrip are barred by *laches* or limitation. The right to redeem exists as long as the debt is kept alive, and this debt was kept alive by payments both before and after 1872. The company assumed the payment of the debt and partly kept its agreement, paying part of both principal and interest. Besides, on the question of *laches*, as pertaining to this branch of the case, we are inclined to agree with what was said by the learned chancellor in the circuit court, as follows: "I have considered the question of *laches*. The length of time has been very considerable, but as I stated before, the evidence tends to show that this corporation was a close corporation. From 1864 to

1871 or 1872 there was but one meeting of the board of directors. The corporation was owned, controlled and run by Woodbridge Smith. After Woodbridge Smith went out of the control of the corporation it passed into the possession of Van H. Higgins, and has been practically run and controlled, in some manner, by Van H. Higgins. It has so far been treated as a personal matter, that even the distinction between Van H. Higgins individually and Higgins as director has been lost sight of, and all moneys received by him have been deposited to his individual account and checked out by him at his will. The corporation having been run and controlled in that manner; there having been, as I say, during a period of seven or eight years but one meeting of the board of directors; it having held but three or four meetings of the stockholders, so far as the records show, within the life of the corporation, and they being held only for the purpose of electing managers to fill vacancies, presents a state of facts which, it appears to me, prevents the doctrine of equitable *laches* applying to this case."

Our conclusion then is, that the trial court should have set this settlement aside, except as to the Boston mortgage, not only as to the complainant, to enable him to redeem, but as to the company also, and that it was error not to do so. No injustice is done to the holders of the debt for which the stock is pledged to Blodgett, in setting aside the settlement, as the company, or, in case of its inability, then the appellees, as holders of the scrip, must pay both the principal and interest of the debt, not shown to have been paid upon the accounting, before the stock can be redeemed. The evidence is not, however, sufficient to impeach that part of the settlement providing for the re-adjustment of the indebtedness originally due to the Illinois and Wisconsin Land Company, known as the Boston mortgage. That indebtedness had no connection, originally, with the Newhouse debt, and its pay-

ment was not secured by the stock pledged to Blodgett. None of the managers were interested in this indebtedness at the time of the settlement, so far as shown by the evidence. It was one of the conditions of the settlement relating to the Boston mortgage, not only that the mortgage, which rested on about thirty-six acres of the land, should be released, but that the notes of Benson, by which this indebtedness was evidenced, should be surrendered up and canceled. This was done soon after the settlement, and in lieu of all other evidences of this indebtedness certificates were issued by the company entitling the holders to one-tenth of the proceeds of the sale of the ninety-six acres as it should be sold out in burial lots, and which payments were also secured by a new deed of trust of the company to Banks, as trustee, which also provided for the payment of the other nine-tenths of such proceeds,—four-tenths to the holders of the Newhouse debt and five-tenths to the company. This deed of trust should be permitted to stand, so far as it secures the payment of said one-tenth of such proceeds to the holders of said certificates. A different course was pursued in dealing with the Newhouse debt, and for some reason, not explained, it seemed to be the purpose of the parties interested in this settlement to keep the original debt of Benson to Newhouse and others alive, and to make the bonds of the company collateral security for its payment.

*The sale of the Quinten lots and the eighty acres.*—Higgins and Banks having been elected managers to fill the vacancies created by the resignation of Newhouse and by the order of the board declaring Benson's position as manager vacant, at a meeting of the board held November 10, 1873, at which were present Tuttle, Higgins, Banks, Turner and Smith, Blodgett and Blaney being absent, the treasurer submitted a proposition of Banks, Higgins and Smith, three of the five managers present, and Deming, the trustee of the Illinois and Wisconsin Land Com-

pany, to sell to the cemetery company certain lots called the "Quinten lots," containing about eight acres, embraced in its enclosure but not yet belonging to the company, on condition that the company issue to Messrs. Banks, Higgins and Smith $8000 of the ten per cent bonds of the company, payable in 1882, and agree to pay to Mr. Deming, trustee, one-tenth part of the proceeds derived from the sale of the lots as sold, and convey the lots to J. N. Banks, trustee, subject to the conditions of the deed of trust to him, bearing date in July, 1872. On motion of Mr. Turner the proposal was accepted, and the executive officers were authorized to execute the papers as drawn up and presented. These lots had been purchased by these three managers two months before for $2500, and the proposition to sell them to the company for $8000 could not have been adopted without their votes. The lots were conveyed to the company, and on November 10, 1873, the company executed its deed of trust to Banks, as trustee, conveying the same lots to secure $8000 of bonds, for $2000 each, and to secure one-tenth of the proceeds of the lots to Deming, as trustee of the land company, and reciting that Higgins, Banks, Smith and Deming, trustees, were the parties in interest under the trust deed to Banks of July, 1872, and were the joint owners of the property conveyed, in the same proportions as under the trust deed of July, 1872, this deed securing the $8000 bonds upon the same trusts and conditions as declared in the deed of trust of July 22, 1872. At the date of the accounting before Boyesen, master, whose report was filed June 26, 1890, the principal of the Quinten lot bonds remained unpaid. The cemetery company had received to that date, for sales of the Quinten lots, a total sum of $17,072.50, one-tenth of which had been paid over to Banks, as trustee.

Appellants' counsel admit that this sale "cannot stand upon the contract itself, since three of the vendors were managers of the company, voting for the sale, and there was no quorum without their vote," but they insist the

sale must stand for the reason that the company has sold a large portion of the lots, and had at the trial already received therefrom $17,072.50, and that if the sale is to be rescinded these proceeds must be paid over to the vendors. No further authority need be cited to show that such a sale cannot be sustained. Nor can we concur in the view that the proceeds of the sales by the company must be paid over to these vendor-managers. They purchased the lots while holding the position of managers, but took title to themselves in order that they might sell to the company, or, rather, to themselves, as managers of the company, for a profit. It must, on the evidence, be conclusively presumed that they purchased the lots for the company, and that all profit arising from the transaction belongs to the company. The trial court found that Higgins owned three of the bonds taken from the company on this purchase, and the National Life Insurance Company the fourth, taken with notice, and that it also held the Boston mortgage interest, in which was included the right to receive ten per cent upon the sales of these lots, and the court held, that "an account must be taken of all moneys paid on these bonds, to whom paid and when paid; also, like account as to the one-tenth proceeds out of sales of these lots; the bonds to stand as security, *pro rata*, for the amount paid for the lots, and as if issued for that amount. If said bonds are so paid, the same to be surrendered, and the balance, if any, decreed to be paid by the party defendant herein receiving the same, to the treasurer of the corporation, all payments to be credited as on date of payment." We fully concur in this holding.

In July, a few days after the settlement of July 17, 1872, Higgins purchased and had conveyed to him eighty acres of land adjoining Rosehill cemetery for the price of $24,000. In September, 1873, upon valuations fixed thereon by real estate experts of Chicago, at about $1000 per acre, he obtained a loan of one Walker, by giving a

deed of trust therefor on said tract for $25,000.  At the same meeting of the managers, in November, 1873, at which the sale of the Quinten lots was made to the company, Higgins submitted a written proposition to sell this eighty-acre tract to the company for $80,000, to be paid by assuming the $25,000 mortgage, bearing ten per cent interest, the balance to be secured by a second mortgage on the land for $55,000, payable in 1890 or before, without interest for the first two years.  He further proposed, that if the receipts were insufficient to pay this interest and the interest on the preferred stock and all liabilities of the company, he would accept its notes for the interest due him, which should bear ten per cent interest until paid, and in case of necessity would advance the money to pay the interest on the $25,000 mortgage for the first two years, the notes taken for interest to be a lien, in like manner as the mortgage itself.  The proposition was accepted and the sale made accordingly, Higgins and his wife conveying the property subject to the $25,000 encumbrance, by a deed dated November 11, 1873.  The testimony is conflicting as to the value of this land at the time of its sale by Higgins to the company.  The witnesses for appellees, principally farmers residing in the vicinity, fix its then value at an average of about $200 per acre.  Appellants' witnesses, real estate experts in Chicago, fix its value at the date of the sale at $1000 per acre.  One of these notes of $8000 given for the purchase money by the company, was, soon after the transaction, transferred by Higgins to Banks, and in December, 1877, Banks, for some reason not shown by the evidence, made a gift of it to the company.  It is not shown by the evidence that he had any interest in the land at the time of its sale to the company, and it cannot be said that the evidence shows, even indirectly, that any manager except Higgins was interested in it or in its sale to the company.  True, it followed immediately the sale of the Quinten lots, in which three of the managers were

interested, but there does not appear to have been any connection between the two transactions. The trial court found that the price for which it was sold to the company was much beyond its market value at the time of the sale, but that as many valuable improvements had been made upon it, and it had been in this way connected with the cemetery, the company should retain it, but that the stockholders have the right to demand that the excess over the real value be refunded to the company, or charged to Higgins in reduction of that part of the Newhouse debt held by him, and that an issue as to such value should be made and tried by a jury, and that the $55,000 mortgage should stand as security for the amount so found to be such reasonable value.

The trial court having heard the witnesses testify as to the value of this land had better opportunities of coming to a correct conclusion than we have from reading the record, and if this were the only question here involved we would not be disposed to disturb the finding. But in view of the testimony of witnesses introduced by the defendants, versed in the values of real estate in and near Chicago, and of the land in question, and of the prior appraisement for the purpose of obtaining a loan of $25,000, fixing such value at $1000 per acre, it would seem not at all improbable that the land was worth near that amount at the time of this sale. The evidence shows there were great fluctuations in the values of such real estate at that time. It is not questioned that if the price charged to the company by Higgins were exorbitant, or so much in excess of the market value as to make the transaction unfair to and oppressive on the company, a court of equity would, upon application made in apt time, set it aside, he being at the time of the sale one of the managers of the company; but it cannot be said that because he paid only $24,000 for the land he was under any obligation to sell it to the company for anything like that amount. He was not a manager or other officer

of the company when he bought it, although he had had dealings with the company and in its obligations, and may have expected to become such manager. However, such a transaction ought not to be set aside on mere suspicion. He had the right to purchase the land, and to keep it or to sell it to the company, as he saw fit. He was entitled, also, to the benefit of whatever knowledge he may have had, at the time of his purchase, of the probable needs of the company and of the probable rise in value of the land, from any .cause and for any use. He was then under no obligation to the company, and owed no duty to it in this respect. Whatever increase of value there was before the sale, as well as the benefit of his own bargain in its purchase, belonged to him. It must be held, under the evidence, that the company, in its purchase, was represented by a majority of disinterested managers,—at least there is not sufficient evidence to show the contrary. They may have been wisely looking to the future interests of the company, and have then honestly concluded that this tract of land would prove of much greater value to the company than the price asked for it, although it may have then seemed high.

But if it be conceded that the price was so excessive as to make the sale unfair and oppressive, can appellees or the company now have the sale rescinded without restoring to Higgins the land? We think not. The sale was made nine years before this bill was filed. Higgins and wife made and delivered to the company a warranty deed, which was recorded in the recorder's office of Cook county in 1873, soon after it was made, and which recited the consideration paid as $80,000. The trust deed executed by the company for the $55,000 balance of purchase money, subject to the $25,000 mortgage on the property, was also recorded, but recited that the $55,000 was a loan. It cannot, perhaps, be said that the holders of stock and scrip of the company had notice of the transaction and

its terms at the time, by reason of the recording of the deed and mortgage, but the company took possession of the property, and some time after the purchase made valuable and permanent improvements upon the land, expending large sums of money therefor. A greenhouse was built, lots laid off, nursery and flower garden planted, and a sewer extended from the cemetery across it for drainage purposes, and the property was otherwise improved and identified with the cemetery. The trial court found that it was to the interest of the company that it keep the property, and directed a partial rescission only,— merely as to the price to be paid. No lots had been sold, however, and the land had not been taken into the cemetery inclosure, and there yet remained about seventy acres unsold of the other cemetery lots. Appellees have not asked to have this sale rescinded *in toto,*—the land restored to Higgins, and the payments of money or other things of value restored to the company, but wish to retain the property at an equitable valuation. He who seeks equity must do equity, and it would not seem to be equitable to allow the company to appropriate the property, so that it could not be restored to Higgins, and then, nine years after the sale, have a rescission only as to the price. It might well be that Higgins would not have sold to the company for what the land would have brought in 1873 in the market. He doubtless bought it for a speculation, and he had a right to keep it until he could get his price for it, and we know of no power in a court of equity to compel him to sell the land for its market value, and to undertake now to fix that value as the measure of pay for this land would seem to place in jeopardy the rights of all the parties, while to rescind the sale *in toto* would probably be no benefit to either. Nor have appellees asked for such rescission. We are of the opinion that neither the complainant nor the company is entitled to a partial rescission. *Warren* v. *Walbridge,* 61 Ill. 173; *Harts* v. *Brown,* 77 id. 226; *Twin Lick Oil Co.* v.

*Marbury,* 91 U. S. 587; *State* v. *Smith,* 48 Vt. 266; *Ashhurst's Appeal,* 60 Pa. St. 290; *Wright* v. *Peet,* 36 Mich. 213; *Peabody* v. *Flint,* 6 Allen, 52; *Jennings* v. *Gage,* 13 Ill. 610; *Smith* v. *Doty,* 24 id. 164; *Bowen* v. *Schuler,* 41 id. 192; *Lovingston* v. *Short,* 77 id. 587; *Preston* v. *Spaulding,* 120 id. 208; *Masson* v. *Bovet,* 1 Denio, 69; *Thayer* v. *Turner,* 8 Metc. 551; *Kimball* v. *Cunningham,* 4 Mass. 502; *Stewart* v. *Dougherty,* 3 Dana, 479. It could not be presumed, as in the case of the Quinten lots, that Higgins purchased this land for the company. We must therefore hold that the trial court erred in setting aside the sale of the eighty-acre tract.

*The Babcock quarter interest.*—What is known in the record as the Babcock quarter interest was the one-quarter interest owned by Blodgett in the original Newhouse debt for unpaid purchase money due by Benson upon his purchase from Newhouse and his associates in 1857. It was a part of the purchase money encumbrance assumed by the cemetery company on the purchase of the lands from the assignees of Benson, to secure which the bonds of 1859 and of 1872 were also issued. Each of these interests was originally evidenced by the Benson notes and nine of the original bonds of 1859, of $1000 each, and by one of $242 of the company, given as collateral security, making the aggregate of the principal of each quarter interest $9242, upon which small amounts only had been paid, of principal and interest. Blodgett retained his quarter interest until 1866, when he sold it to J. W. Smith (together with a claim for about $1000 which he had advanced to the company) for $3500. Smith sold this Blodgett interest to the Babcock Manufacturing Company in 1878. Higgins became president of the Babcock company about the year 1872, and continued as such six or eight years, and down to about the time of its failure. On April 7, 1880, the Babcock company executed an assignment to David Quigg for the benefit of its creditors. Quigg had been a law partner of Higgins from 1865 to

1872. This quarter interest was inventoried by the company in its assignment at less than half its face value. Quigg, as assignee, received an offer of $10,000 from parties in Louisville for the purchase of this debt. Higgins, acting, as it is said, for his firm of Higgins, Laflin & Furber, raised the bid to $10,500, which was about one-third its face value. August 24, 1880, the county court of Cook county entered an order *nisi* authorizing the assignee to accept the latter bid, and to sell at private sale the debt to Higgins for $10,500 cash, unless objections were filed on or before September 10, 1880, with a higher bid, after notice to the creditors. No higher bid being received, the county court confirmed the sale. The securities were struck off to Higgins individually, although it is said they were purchased for his firm. Higgins or his firm having thus acquired the Babcock interest, sold it to the National Life Insurance Company, of which Higgins was president, October 20, 1881. It does not appear that Higgins ever informed the board of managers of his intended purchase of this interest. The Babcock company obtained these securities from Smith through some arrangement between them and Higgins not fully shown by the evidence, and which does not seem to be important. It is not shown what the insurance company paid for the securities, but Higgins testified it paid more than he did. When Higgins bought this debt he was one of the managers of the company and its treasurer.

The trial court made the following finding in its decree : "That at the time of such purchase from said assignee, said Higgins was the treasurer and one of the board of managers of said Rosehill company, and at the time, and for some years prior, was and had been in control of said cemetery company almost as absolutely as if he had been sole owner of the same, and had at that time funds in his hands, and was constantly receiving a large revenue belonging to said Rosehill Cemetery Company, and kept all its funds in his individual bank account, mingled with

his own private funds.   The court further finds that said Higgins did not inform the said board of managers of the intended sale of bonds or interest belonging to said Babcock Manufacturing Company, and that said board of managers did not know thereof, and that under the peculiar controlling relations he bore to said corporation, and the facts in the case, said Higgins, and those claiming under him, ought not to be permitted to enforce the claim to said Babcock bonds or interest in said Benson indebtedness against said company for any more than the amount which he, said Higgins, and his assigns, actually paid for it." Appellants insist that this finding and decreee of the court respecting the Babcock interest are erroneous ; that Higgins had the same right to purchase the outstanding obligations of the company at a discount, and to demand payment of them in full, as a stranger had.   They also insist that the evidence does not sustain the findings of the trial court.

The evidence does not show that Higgins did not keep accurate accounts, as treasurer, of all moneys of the company received by him and properly account for the same, but simply that he kept no separate bank account as treasurer, and deposited the company's moneys with his own.   The books were kept in this way, it was explained, because it was constantly necessary to overdraw the company's account to enable it to meet demands against it as they were presented, and that Higgins was more lenient in permitting this than the bank.   It does not appear that the company suffered any loss by this method of book-keeping.   It was shown that Higgins advanced considerable sums of money to the company from time to time, and it is claimed that by so doing he saved it from total bankruptcy, and prevented its property from being sold, and that instead of having in his possession funds of the company at the time of the purchase of the bonds from the Babcock company, the cemetery company was indebted to him in a large amount for

such advances. This is, doubtless, to a large extent true. But he had gradually increased his interest in the company until he practically controlled it. He already owned the greater part of the mortgage and pledge debts and substantially all of the preferred stock, and was insisting on the invalidity of the outstanding common stock, or certificates of interest, and the scrip. By the sale of the eighty-acre tract to the company, and in other ways, he had enormously increased the indebtedness of the company, principally to himself. The matter of the proposed sale of these securities by the assignee of the Babcock company was pending several months. He knew this, and was fully informed of the manner in which they were secured and of their value. They were over-due. It was the duty of the managers, of which he was one, to make provision for their payment out of the resources of the company, if able to do so. He must have known that it would be for the interest of the company to take up an indebtedness bearing so high a rate of interest, when it could be done for less than one-third of its face value, yet, occupying the position he did and with the information he then had, he did not inform the other managers of such proposed sale, nor give the company or its stockholders any opportunity to receive the benefit of the transaction. The income of the company that year was large, exceeding $30,000, and its ordinary expenses about what they had previously been each year,—between $5000 and $6000. The balance of this income was expended in making an artificial lake and in digging an artesian well, —improvements which he insisted were necessary, and which, with others, increased the sale of burial lots more than four-fold. True, the company was permitted to overdraw its account with him in meeting these demands and others (but not to pay off any of its bonded debts); but frequent balances were struck, for which he received its notes drawing a high rate of interest, and the company grew deeper and deeper in his debt.

Mr. Justice MILLER, in *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587, in speaking of the obligation of a director to the company and its stockholders in a case, though quite different from this, used language not altogether inapplicable here. He said: "His (the director's) obligation, if he becomes a party to a contract with the company, to candor and fair dealing is increased in the precise degree that his representative character has given him power and control, derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be sole director, or one of a smaller number, vested with certain powers, this obligation would be still stronger, and his acts subject to a more severe scrutiny, and their validity determined by more rigid principles of morality and freedom from motives of selfishness."

In 1 Morawetz on Private Corporations (sec. 521) it is said: "A director or other agent of a corporation may deal with the company, provided it be adequately represented by other agents. He may also purchase property and afterwards sell it to the corporation at an advance, provided it was not his duty, when he made the purchase, to purchase on behalf of the company. So an agent of a corporation may purchase claims against the company at a discount and enforce them in full, if he was not under obligation to make the purchase on behalf of the corporation." The text of the author is supported by the following authorities: *Bradley* v. *Marine, etc. Manf. Co.* 3 Hughes, 26; *Inglehart* v. *Thousand Island Hotel Co.* 32 Hun, 377, and 109 N.Y. 454; *St. Louis and Ft. Scott Railroad Co.* v. *Chenault*, 36 Kan. 57; *Carpenter* v. *Danforth*, 52 Barb. 581; *Stratton* v. *Allen*, 16 N. J. Eq. 232.

In *Inglehart* v. *Thousand Island Hotel Co.* and *St. Louis, etc. Railroad Co.* v. *Chenault, supra*, it was expressly decided that a director, who was in the one case also treasurer and in the other president of the company, had the right to purchase outstanding claims against the company at a discount and enforce them in full. On the other hand,

154—25

it is said in 2 Cook on Stock and Stockholders (sec. 660, 3d ed.): "It is an abuse of trust for a corporate director to purchase property which he knows the corporation will need, and then to sell the same to the corporation at an advanced price.   *   *   *   It is a fraud on the corporation and on corporate creditors for the directors to buy up at a discount the outstanding debts of the corporation, and compel it to pay them the full face value thereof.   In such a case the directors may be compelled to turn over to the corporation the evidences of indebtedness upon being paid the money which they gave for the same."

Where the rights of creditors are involved, a stricter rule is applied than the company or its stockholders can invoke.   The directors are the agents of the company and its stockholders in the management of the corporate property and affairs, and when the corporation becomes insolvent they hold its property in trust for its creditors.   This court has held that a director may deal with the corporation, loan money to it, take security therefor and enforce the same, but his acts must be fair and free from oppression, and he must act for the interest of the corporation. (*Harts* v. *Brown*, 77 Ill. 226.)   We have also held that a director may purchase outstanding obligations of the company and enforce their collection. (*Merrick* v. *Peru Coal Co.* 61 Ill. 472.)   But the question, so far as we know, has not before been presented whether or not he may purchase such claims at a discount and enforce them in full. If he act fairly and for the interest of the corporation we think he may.   He certainly would be doing the corporation no injury in case his management were in the interest of the corporation, and it were given a fair opportunity to itself become the purchaser, and could not or would not embrace such opportunity.   We are of the opinion, however, from the evidence in this case, that Higgins could not, under the circumstances attending the transaction, purchase these securities, as he did, at a discount,

and hold them against the company for payment in full, but that the company and its stockholders have the right to treat the purchase as made for their benefit. Nor can it make any difference that such purchase was made by him for himself and others as a co-partnership. His co-partners were charged with full knowledge of all the facts and circumstances attending the transaction which were known to him.

It is claimed, however, by counsel for the National Life Insurance Company, to which company Higgins, Laflin & Furber assigned the securities, that whatever infirmities may have attached to them while in their hands, the insurance company took them for value and without notice of any such infirmities, and may hold them against the cemetery company until they are fully paid. This is upon the view that Higgins, who was at the time the president of the insurance company, was not, in the transfer of the securities to it, its agent; that while, ordinarily, notice to the president of a corporation is also notice to the corporation, such is not the law when the president is dealing with it in his own interest and against the interest of the corporation; that notice to the corporation through its officer rests upon the presumption that the officer will communicate such notice, but that it cannot be presumed that Higgins, although president of the insurance company, would, in selling these securities to it, make any communication derogatory to them, his title thereto, or their value. We think the rule contended for is supported by sound reason and the authorities as well. In *Barnes* v. *Trenton Gas Co.* 27 N. J. Eq. 33, it was said: "The general proposition is undoubtedly true, that notice of facts to an agent is constructive notice thereof to the principal himself, where it arises from, or is at the time connected with, the subject matter of his agency. The rule is based on the presumption that the agent has communicated such facts to the principal. (Story on Agency, sec. 140.) On principles of public policy the

knowledge to the agent is imputed to the principal. But the rule does not apply to a transaction such as that under consideration, [the president selling to the company,] for in such a transaction the officer, in making the sale and conveyance, stands as a stranger to the company. (*Stratton* v. *Allen*, 1 C. E. Green, 229.) His interest is opposed to theirs, and the presumption is, not that he will communicate his knowledge of any secret infirmity of the title to the corporation, but that he will conceal it. Where an officer of a corporation is thus dealing with them in his own interest opposed to theirs, he must be held not to represent them in the transaction, so as to charge them with the knowledge he may possess but which he has not communicated to them, and which they do not otherwise possess, of facts derogatory to the title he conveys. *Commercial Bank* v. *Cunningham*, 24 Pick. 270; *Kennedy* v. *Green*, 3 M. & K. 699; *In re European Bank*, L. R. 5 Ch. App. 358; *In re Marseilles Extension Railway Co.* L. R. 7 id. 161; Angell & Ames on Corp. 308 ; *Winchester* v. *Baltimore and Susquehanna Railroad Co.* 4 Md. 231."

But it must be borne in mind that this debt was overdue, and from that fact alone the insurance company was charged with notice of all the infirmities attaching to it in the hands of Higgins. Hence it was not necessary to charge the insurance company with notice,—that it should be presumed to have such notice from Higgins, as its president. In such a case the transferee can acquire no better title than his transferrer had. 1 Daniel on Negotiable Instruments, (2d ed.) 640. This debt was the quarter interest of the Newhouse debt, evidenced by the Benson notes and the bonds of the company issued as collateral security for its payment.

Counsel for appellants contend that it was the debt of the company, and evidenced by its bonds issued in pursuance of the settlement of 1872; and that at the time of the purchase by the insurance company the debt was not due. By the express terms of this settlement these

bonds were issued to take up and stand in place of the bonds issued and delivered by the company in 1859, as collateral security for the payment of the Benson notes, which were kept alive and the time of their payment at that time extended five years.  The Benson notes were the original and primary indebtedness.  Blodgett, in his answer, so alleged, and alleged also that it had never been released or waived.  It may be that all the evidences of this debt obtained by the National Life Insurance Company when it made the purchase were the bonds issued in 1872, payable ten years after their date.  But both the records of the company and the bonds themselves showed that they were issued as mere collateral security—and the insurance company was chargeable with notice of this fact.  On the back of these bonds was printed this indorsement:

"ROSEHILL CEMETERY CO.

$3538.52.                 *Bond.*                 No......

"This bond is issued for the principal and interest, and stands in place of bond No...., covering the interest accrued thereon to July 23, 1872,—which original bond was one of a series of bonds, amounting in all to $36,968, issued by the Rosehill Cemetery Company as collateral security for the payment of the sum above mentioned, from F. H. Benson to John S. Newhouse, S. F. Johnson, W. S. Johnson and H. W. Blodgett, secured by notes and mortgage from said Benson to said Newhouse; said mortgage bearing date April 23, 1857, and being recorded July 11, 1857, in the recorder's office of Cook county, in book 33 of mortgages, page 403."

We are therefore of the opinion that the trial court did not err in its decision on this branch of the case.

*The preferred stock.*—At a meeting of the managers, June 18, 1860, the issue of $25,000 of preferred stock was authorized to pay the debts of the company, or, to use the language of the resolution, "for the purpose of the

$15,000 fund, as provided for in the agreement heretofore
made between the company, bearing date May 23, 1860."
A meeting of the stockholders had previously been called,
and by resolution had authorized the board of managers
to issue that amount of preferred stock, which action of
the stockholders' meeting is recited in the resolution
of the board of date June 18, 1860.  It does not appear
that any holder of stock or certificates of interest ob-
jected to such issue.  Benson and others, of the first
board of managers, and certificateholders, were present
and voted for it.  In pursuance of this action of the
stockholders and managers, it seems, from the evidence
so far adduced, that preferred stock to the amount of
$25,000 was issued, and used in paying various liabilities
incurred by the company.  The resolution authorizing its
issue provided that the holders of this stock should be
entitled to receive thereon a semi-annual dividend, at
the rate of ten per centum per annum, prior to the pay-
ment of any dividend on the other stock of the company.
This dividend seems to have been paid, as authorized,
for many years, either in money or the interest-bearing
notes of the company.  The issuing of this stock appears
to have been acquiesced in by all the holders of other
certificates of stock and scrip.  The certificate of com-
mon stock found in the possession of Dempster, issued
after the issue of the preferred stock, recited that the
interest of the holder of each share was $\frac{1}{1750}$ part of the
whole, while certificates previously issued fixed each
share as $\frac{1}{1500}$ part of the whole.  For more than twenty
years the stockholders, and the company under different
managers, seem to have recognized the validity of this
preferred stock.  It was bought and sold for many years
after its issue, among the officers and others interested
in the company, and to some extent among outsiders,
without its validity ever being questioned, so far as the
record shows.  The learned chancellor of the circuit
court held, however, that no authority was conferred by

the charter to issue these preferred shares; that they were invalid as preferred shares, and that the holders of them should account for the dividends paid thereon, and the question as to whether they should stand as valid shares of common stock was reserved for further determination. The charter certainly contains no authority to give preference to one share above another, and if this were a proceeding by a dissenting stockholder to enjoin the issue of such stock he would undoubtedly be entitled to his writ. But let it be admitted that the act of the managers in issuing this stock was *ultra vires;* can the holders of either the stock or scrip, whether suing for themselves or on behalf of the corporation, now take advantage of it, and have such preferred stock declared invalid for lack of power in the charter to issue it? We do not think he can. It is now too late to raise that question. It would be highly inequitable and unjust to permit the company or any stockholder to insist on the invalidity of this stock for mere lack of power in the charter to issue it, after they have received full value for the stock, authorized its issue, paid dividends on it, and in many ways treated it as valid for twenty-two years.

In *Kent* v. *Quicksilver Mining Co.* 78 N. Y. 159, preferred stock had been issued by the company without authority conferred by the charter or other law, and it was held that after four years of delay and acquiescence in the act of the directors in issuing the stock, even those stockholders who had not consented in the first place, and their assigns, were barred by *laches* and were estopped. After reciting the publicity given to the act of the company in issuing the stock, the court said : "For the lapse of four years, however, there was no action of the company, or of any individual stockholder, to have a judicial declaration that the company had exceeded its powers in the creation of the stock, and that it was invalid ;" and "that the stockholders, by acquiescing in the action of

the corporation in making the preferred stock, have ratified and assented thereto, and that the same is binding
on them by reason of such assent and ratification." The
court further said that the application of the doctrine of
*ultra vires* has two phases : one in which the public is concerned, and the other which concerns the company and
its stockholders, only; that as to the first, the assent of
the stockholders to the unauthorized act is of no avail,
but that "when it is a question of the right of a stockholder to restrain the corporate body within its express
or incidental powers, the stockholder may, in many cases,
be denied, on the ground of his express assent, or his intelligent, though tacit, consent to the corporate action."
Relief was denied, although it was expressly held that
there was no power conferred by the charter, expressly
or otherwise, to create preferred stock.

In 2 Beach on Private Corporations (sec. 808) it is said
that the right to create preferred stock is merely a question of contract, and if all agree to a modification of the
original agreement it is legalized, and that without charter authority the corporation may, after the issue of the
common stock, create preferred stock by consent of all
the stockholders affected thereby, and that by acquiescence shareholders are estopped to deny the validity of
the issue.

The objections to the issue of preferred stock without
power therefor under the charter are based upon the, assumption that such issue would be in violation of the
contract rights of the existing shareholders. "If these
existing shareholders unanimously give their consent to
an issue of preferred shares, these objections would have
no application." 1 Morawetz, sec. 464. See, also, *Bradley* v. *Ballard*, 55 Ill. 413, and *Ward* v. *Johnson*, 95 id. 215,
where it was held the corporation was estopped from
setting up the defense of *ultra vires.*

The trial court determined nothing as to this stock, as
we understand the decree, except the question of prefer-

ence in dividends, hence we confine our opinion to the same question, leaving the parties at liberty to litigate all questions relating to this stock and its issue as they may be advised. It is, however, held, that if otherwise properly issued and outstanding as corporate stock it may be valid as preferred stock by the original authority and consent of all the shareholders, or by their subsequent ratification or long acquiescence, notwithstanding the charter contains no authority for the issue of preferred stock. So much of the decree, therefore, as holds said stock invalid as preferred stock for want of power to issue it, and as requires, for the same reason, the holders thereof to account for the dividends received thereon, is held to be erroneous and is reversed, but no opinion is expressed as to whether or not such dividends were not, for other reasons, improperly paid.

We have considered the questions raised as to the sufficiency of the bill of complaint, but do not think them of sufficient importance to add to the length of this opinion by reviewing them here. We are of the opinion the bill is sufficient.

Our conclusion therefore is, that the judgment of the Appellate Court be reversed, and the decree of the circuit court be in part affirmed and in part reversed, as hereinbefore indicated, and that this cause be remanded to the circuit court, with directions to enter a decree in accordance with this opinion, and to proceed with the accounting on the basis of the decree as directed to be modified and for further proceedings consistent with this opinion. Each party will pay his own costs in this court and in the Appellate Court except the cemetery company, which, being the bone of contention between the parties, is not to be taxed with any of such costs.

*Affirmed in part and in part reversed.*